RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0224p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANDY E. MAYA,

*Defendant-Appellant*.

> No. 19-5100

─────────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:18-cr-00013-2—David L. Bunning, District Judge.

Argued:  May 8, 2020

Decided and Filed:  July 20, 2020

Before:  SUHRHEINRICH, BUSH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Laura Welikson, BRADLEY ARANT BOULT CUMMINGS LLP, Jackson, Mississippi, for Appellant.  James T. Chapman, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.  **ON BRIEF:**  Laura Welikson, BRADLEY ARANT BOULT CUMMINGS LLP, Jackson, Mississippi, for Appellant.  James T. Chapman, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge.   The police caught Andy Maya and two accomplices smuggling 50 pounds of marijuana into Kentucky in a BMW transported on a car-hauling truck

from out of state. When the police searched Maya's home, they found a firearm in his bed near over $20,000 in cash and money orders. Maya admitted to a drug-trafficking conspiracy and to possessing the firearm. But he denied possessing the gun "in furtherance of" the conspiracy—an offense that triggers an additional five-year prison term. 18 U.S.C. § 924(c)(1)(A)(i). A jury nonetheless convicted Maya of that offense. This appeal raises two questions: Could a rational jury conclude that Maya possessed the firearm "in furtherance of" the drug conspiracy based on evidence that he, among other things, kept his firearm near his drug proceeds? And did the district court properly permit an officer to opine on the significance of the gun's location near the funds? We hold that a rational jury could find that Maya possessed the gun to assist the conspiracy and that the district court did not abuse its discretion in admitting the officer's testimony. We thus affirm.

I

Given the verdict against Maya, we recount the facts in the light most favorable to the government. *United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013). Maya attended high school in northern Kentucky with Edgar Mendoza Valdovinos and Matthew Meyers. He graduated in 2015. Maya remained close with Meyers after graduation, but Mendoza moved to the State of Washington.

By 2017, a 20-year-old Maya lived with his parents and two older brothers. Unemployed, Maya made money selling marijuana with Meyers. For most of 2017, Maya obtained marijuana from a local source. He and Meyers sold between one and five pounds a week. Maya did not sell drugs from his home because he did not want his family to learn of his drug dealing. He did, however, keep drug money in his bedroom, not in a bank. Maya avoided banks because it would look suspicious for an unemployed person to have significant funds. He also owned a 9-millimeter firearm that he typically kept under his pillow in his bed. Meyers testified that Maya would occasionally drive around with his gun and would sometimes have it when he sold drugs. Meyers also had a separate gun that he carried when he sold drugs. According to Meyers, he bought this gun off the street with Maya's money so Maya allegedly told him: "It's my gun, but you can carry it."

While in Washington, Mendoza entered the drug-trafficking trade as well. He returned to Kentucky in October 2017 and reconnected with Maya. Maya learned that Mendoza could obtain marijuana from Washington at much cheaper prices. Mendoza would hide the drugs in his BMW and ship the car across the country using an unsuspecting transportation company. Maya began buying some of the marijuana from these shipments. Between October 2017 and January 2018, Mendoza shipped three or four loads of between 40 and 50 pounds of marijuana. Paying in cash each time, Maya bought a substantial portion of the shipments (11 pounds of the initial shipment and 20 to 25 pounds of the later shipments). Mendoza charged Maya between $1,200 and $1,500 per pound. The three accomplices rented a storage unit at a facility in Florence, Kentucky, and their deals occurred at or near this facility. By the end of 2017, Maya had increased his weekly marijuana sales to about 10 to 50 pounds per week.

Mendoza's last shipment came in early January 2018. Maya planned to purchase almost the entire 50-pound load. On the night of January 8, Mendoza stayed with Maya at his home. Mendoza saw Maya's gun in his room that night, which was the first time he had seen it.

The next morning, Maya and Mendoza left for a gas station near the Florence storage facility, the place at which the transportation company would drop off the BMW with the drugs hidden inside. The two drove to the gas station in Meyers's Mercedes. (Maya and Meyers regularly borrowed each other's cars; Maya owned a Nissan 370Z.) Because he was indebted to Maya, Meyers agreed to meet the car hauler and pick up the BMW. He drove to Florence in the Nissan. With the other accomplices looking on, Meyers obtained the BMW at the gas station and drove it to the storage facility. Mendoza and Maya followed close behind. At the storage facility's front gate, Meyers typed the security code to gain entry but received an "access suspended" message. The next thing Meyers knew "a swarm of cop cars" had surrounded them.

As it turns out, law enforcement had been on to the trio for some time. Kentucky FBI agents had received a tip from the Seattle FBI office that a BMW filled with marijuana would be shipped to Florence in a car-hauling truck. The night before, the police located a truck fitting that description at a weigh station south of Florence. A drug-sniffing dog alerted to the smell of narcotics at the BMW. Officers stayed with the truck that night and traveled with it to Florence the next morning. They watched as Meyers picked up the car and drove to the storage facility.

The police arrested Maya, Meyers, and Mendoza. They found $1,274 on Maya and Meyers's gun in the Nissan.

Later that day the police searched Maya's home. They located his loaded 9-millimeter handgun in between the mattresses of his bed and extra ammunition on his dresser. They also discovered large sums of currency: $8,545 in cash in a jacket in his closet, $6,340 in cash underneath a television stand, and $5,900 in money orders on his dresser.

The government charged Maya with conspiring to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and with possessing the handgun found in his bed in furtherance of that drug conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A). Maya pleaded guilty to the conspiracy count but stood trial on the firearm charge.

Two parts of Maya's trial are particularly relevant. Maya presented significant evidence to suggest that he did not possess his gun "in furtherance of" the drug conspiracy. His brother testified that he never saw Maya take the gun outside their home and regularly checked that it remained under his pillow (out of concern that Maya might be up to no good). Maya's mother testified that Maya bought his firearm shortly after an attempted break-in at their home. She asserted that she would clean his room every day and the gun would always be there. To raise doubts about whether the funds in Maya's room were drug proceeds, his mother added that she and her husband ran a business that transported packages to Mexico and would pay Maya $1,500 in cash whenever he made such a trip.

The jury also heard from DEA Special Agent Jeff McKinley about aspects of the drug-trafficking trade. McKinley testified that drug traffickers often keep large amounts of cash or money orders on hand rather than in banks and that the possession of $20,000 would be consistent with a midlevel drug dealer. He also testified that drug dealers use guns for protection because they often have large amounts of cash and cannot rely on the police to protect them. And he noted that the gun's placement under the mattress made it "easily accessible" and that this location near the money was "consistent with the firearm being used to protect the funds."

The jury found Maya guilty. The district court imposed a 93-month term of imprisonment—33 months on the drug-conspiracy charge to be served consecutively with the 60-month minimum on the firearm charge.

II

Maya makes two arguments on appeal. He says that the government presented insufficient evidence to prove that he possessed his gun "in furtherance of" the drug-trafficking conspiracy, a claim that we review de novo. *See United States v. Ham*, 628 F.3d 801, 807 (6th Cir. 2011). And he says that the district court wrongly allowed Agent McKinley to opine about whether Maya used his gun to protect the money in his room, a claim that we review for an abuse of discretion. *See United States v. Cleveland*, 907 F.3d 423, 435 (6th Cir. 2018).

A

A court "must enter a judgment of acquittal" if the government's evidence is "insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(2). But a defendant making this type of claim faces a "demanding legal standard[.]" *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). A court asks only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This "limited review" bars courts from "intrud[ing] on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319).

1

We start with the background law against which we must weigh the evidence from Maya's trial. *See Potter*, 927 F.3d at 453. The relevant federal statute provides:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, *during and in relation to* any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if

committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, *uses or carries* a firearm, or who, *in furtherance of* any such crime, *possesses* a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—(i) be sentenced to a term of imprisonment of not less than 5 years[.]

18 U.S.C. § 924(c)(1)(A) (emphases added). This statute creates two offenses. It covers both a person who "uses or carries" a firearm "during and in relation to" a crime of violence or drug-trafficking crime and a person who "possesses" a firearm "in furtherance of" such a crime. *Id.*; *see United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004). Congress added the second "possession" offense in 1998 after the Supreme Court held that the first "use" offense required more than possession of a firearm during a crime. *See United States v. Mackey*, 265 F.3d 457, 461 (6th Cir. 2001) (discussing *Bailey v. United States*, 516 U.S. 137 (1995)).

Maya was convicted of the possession offense. It requires the government to prove not just that a defendant "possesse[d] a firearm" but also that the defendant did so "in furtherance of" a "crime of violence or drug trafficking crime[.]" 18 U.S.C. § 924(c)(1)(A). Maya does not dispute he "possessed" the gun found in his bed. Nor does he dispute he committed a "drug trafficking crime": the drug conspiracy to which he pleaded guilty. His sufficiency challenge instead turns on whether he possessed the gun "in furtherance of" that conspiracy. To address Maya's argument, we find it helpful to ask both a substantive question and an evidentiary one: What does this in-furtherance-of element require? And how may the government prove it?

*What does the in-furtherance-of element require?* "By requiring that the possession be 'in furtherance of' the crime, Congress intended a specific nexus between the gun and the crime charged." *Mackey*, 265 F.3d at 462. The statutory text shows the nature of this nexus. Congress modified the verb "possesses" with a pair of prepositional phrases: "in furtherance" and "of any such crime." *See Dean v. United States*, 556 U.S. 568, 573 (2009). When used in this way, "in" is a "function word to indicate [the] *purpose*" for which a defendant must possess a gun. *Merriam-Webster's Collegiate Dictionary* 585 (10th ed. 1994) (emphasis added); *see* 8 *The Oxford English Dictionary* 761 (2d ed. 1989). The object of this preposition ("furtherance") and the next prepositional phrase ("of any such crime") describe the prohibited purpose—the "furtherance" of a crime of violence or drug-trafficking crime. And "furtherance" ordinarily

means "advancement" or "promotion." *Mackey*, 265 F.3d at 461 (citation omitted); *Merriam-Webster's*, *supra*, at 474; 6 *Oxford English Dictionary*, *supra*, at 285. This language thus reaches individuals who possess a firearm for the purpose of aiding or furthering a crime of violence or drug-trafficking crime.

Two broader points confirm this reading. First consider the backdrop against which Congress enacted the possession offense. In 1998, the statute barred a person from using or carrying a firearm "during and in relation to" a crime of violence or drug-trafficking crime. But Congress chose a different "in furtherance of" modifier (rather than the "during and in relation to" modifier) for the new possession offense. Ordinary readers of the statute as a whole would take the different language to signal different meaning. *See Russello v. United States*, 464 U.S. 16, 23 (1983). By requiring a defendant to possess the firearm to aid the crime, we respect this textual difference. *See Combs*, 369 F.3d at 932.

Next consider the way in which courts read the phrase "in furtherance of" in other contexts. The Federal Rules of Evidence permit courts to introduce statements from a party's coconspirators (statements that otherwise qualify as hearsay) if the statements are made "during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Before 1998, courts held that whether a statement was made "in furtherance of" a conspiracy depended on the "intent of the declarant" in making the statement, and they considered whether the defendant made the statement to aid the conspiracy. *United States v. Warman*, 578 F.3d 320, 338 (6th Cir. 2009); *see United States v. Gutierrez*, 48 F.3d 1134, 1137 (10th Cir. 1995); *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993); *United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir. 1989). So too, whether a defendant possesses a firearm "in furtherance of" a crime depends on the defendant's intent in possessing the gun.

In sum, we must ask a simple question: Why did a person possess a gun? As our previous discussion indicates, defendants commit this offense if they possess a gun to aid drug trafficking. *See United States v. Street*, 614 F.3d 228, 236 (6th Cir. 2010). If, for example, a drug dealer owns a gun "to protect the drugs, the proceeds of drug sales, or the dealer himself," that possession-for-protection purpose will facilitate the crime. *United States v. Bailey*, 882 F.3d 716, 721 (7th Cir. 2018); *see United States v. Paige*, 470 F.3d 603, 609–10 (6th Cir. 2006);

*United States v. Swafford*, 385 F.3d 1026, 1029 (6th Cir. 2004). Defendants do not commit the offense, by contrast, if they possess the gun for an "innocent" purpose—such as for "hunting" or as a "wall-mounted antique[.]" *Mackey*, 265 F.3d at 462.

*How may the government prove this element*? In most cases, a defendant will not confess to possessing the firearm to facilitate a drug crime. So the government typically must resort to circumstantial evidence to establish this illicit purpose. But there is nothing unusual about that method of proof. The Supreme Court has "never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). We have likewise held that "circumstantial evidence alone can defeat a sufficiency challenge." *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015); *see United States v. Rogers*, 556 F.3d 1130, 1140 (10th Cir. 2009).

Yet what amount of circumstantial evidence must the government produce to withstand a sufficiency-of-the-evidence challenge concerning this "in furtherance of" element? The mere fact that a gun was located at the same place as a drug crime does not—by itself—suffice to show the required purpose to aid the crime. *See Mackey*, 265 F.3d at 462; *see also United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015). Other factors, though, might adequately establish this purpose. To help answer this "in furtherance of" question, most courts have "list[ed] factors that seem relevant" and have left "it to the trier of fact to apply them to the facts of the case at hand." *United States v. Brown*, 724 F.3d 801, 803 (7th Cir. 2013) (collecting cases). Our court, too, has identified a "non-exclusive list of six factors[.]" *United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013). These factors include: whether the gun was "strategically located so that it [was] quickly and easily available for use," whether it "was loaded," "the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *Mackey*, 265 F.3d at 462.

We add two notes of caution about these so-called "*Mackey* factors." Courts should not lose sight of the forest (whether the defendant possessed the firearm to facilitate the crime) for the trees (whether or how each factor applies). The question whether a defendant possessed a gun for the purpose of aiding a crime does not hinge on simply adding up the factors and asking

whether more of them favor the government or the defendant. The list is simply a tool to help answer whether the required illicit purpose exists. *See id.* And just because some factors are absent does not mean that there is insufficient evidence to sustain a conviction. Take, for example, the factor asking if a defendant legally possessed the gun. Many cases have involved a felon barred from possessing a firearm, and the illegality of that possession helped show more than an "innocent" purpose. *See, e.g.*, *Ray*, 803 F.3d at 264–65. But we have not hesitated to uphold convictions without discussing this factor when other evidence adequately established the illicit purpose. *See, e.g.*, *United States v. Adkins*, 429 F. App'x 471, 477–78 (6th Cir. 2011). As the Seventh Circuit said, it will often be "easier to determine 'furtherance' by a holistic analysis" that asks "whether the defendant's gun facilitated the drug crime" rather than by a "trudge through the factors" that "dissect[s] the issue into parts." *Brown*, 724 F.3d at 803; *see, e.g.*, *Street*, 614 F.3d at 236.

In addition, we have sent mixed signals about whether the first factor (which asks if the firearm was "strategically located") is a *requirement* for concluding that the firearm facilitated the drug-trafficking crime. Some of our cases suggest that the firearm "must be" readily available. *Mackey*, 265 F.3d at 462; *see United States v. Barnes*, 822 F.3d 914, 919 (6th Cir. 2016); *Ham*, 628 F.3d at 808. Others suggest that this factor (like the rest) is a "non-exclusive" data point to help answer the ultimate question. *See, e.g.*, *United States v. Shaffer*, 781 F. App'x 404, 415 (6th Cir. 2019); *United States v. Horton*, 742 F. App'x 973, 979 (6th Cir. 2018). We are skeptical of treating this factor as an absolute mandate. Such a mandate would sit uncomfortably with the statutory text—which asks whether a defendant possessed the gun "in furtherance of" a crime, not whether the defendant kept the gun in a "strategic location." If a drug dealer told an accomplice that he owned a gun to assist with his drug dealing but kept it in a locked safe only for transactions gone really awry, that location would not alter the fact that the defendant possessed the gun to aid his drug trafficking. *See Volkman*, 797 F.3d at 391; *Brown*, 724 F.3d at 803. Such a mandate would also create a circuit conflict. Other circuit courts treat "none of the factors," not even this accessibility factor, as "decisive." *Brown*, 724 F.3d at 803; *see also, e.g.*, *United States v. Shannon*, 715 F. App'x 187, 194 (3d Cir. 2017). Ultimately, though, we need not reconcile our precedent in this case because, as we now explain, a jury could have found Maya's firearm strategically located.

2

The government presented evidence from which a "rational trier of fact" could have found that Maya possessed his gun for the purpose of facilitating his drug-trafficking conspiracy. *Jackson*, 443 U.S. at 319. And a "holistic analysis" rather than the "conventional trudge" through the *Mackey* factors is easier in this case because we see two straightforward theories from which a jury could make the required "furtherance" finding. *Brown*, 724 F.3d at 803.

Theory One: The jury could conclude that Maya kept his gun in his bed to protect the drug proceeds he used to purchase marijuana and continue the conspiracy. It heard testimony from both Mendoza and Meyers that their drug-trafficking conspiracy was ongoing, that Maya bought increasingly larger quantities of marijuana from Mendoza, that Maya always purchased that marijuana with cash, and that Maya sometimes had to go home to get the cash for the drugs. The jury also heard testimony that the police found over $20,000 in cash and money orders in Maya's bedroom. It heard testimony that Maya kept these funds in his room rather than in a bank to avoid questions about why an unemployed 20-year-old had such large sums. And it heard testimony from Agent McKinley, a seasoned investigator, that the money's presence in Maya's home was consistent with its being drug proceeds. From this evidence, a rational jury could conclude that the funds in Maya's room were proceeds of his past drug trafficking and that Maya planned to reinvest at least some of these funds in his growing drug-trafficking enterprise.

The jury next could conclude that Maya possessed his handgun at least in part to protect these drug proceeds. It heard testimony that Maya owned a 9-millimeter handgun the entire time he sold drugs. It also learned that, shortly after Maya's arrest, police found this loaded handgun in an easily accessible gap between the mattresses of his bed close to the drug proceeds. Maya's brother also testified that Maya usually kept that gun in an even more accessible place— underneath his pillow. And Agent McKinley added that traffickers often use handguns for protection because they have large sums of cash, they cannot turn to the police for protection, and their rival drug dealers and customers know these facts.

This evidence would allow a rational jury to conclude that Maya possessed the gun to protect the drug proceeds that he used to buy marijuana from Mendoza for resale. That theory—

that Maya's gun protected the funds necessary to continue the drug conspiracy—would support the conclusion that Maya possessed the firearm to facilitate the conspiracy. In fact, many decisions have suggested that a drug dealer can commit this possession offense if the dealer possesses a firearm for the purpose of "protect[ing] his drug proceeds." *Shannon*, 715 F. App'x at 194; *see United States v. Druger*, 920 F.3d 567, 570 (8th Cir. 2019); *United States v. Naranjo-Rosario*, 871 F.3d 86, 95 (1st Cir. 2017); *United States v. Garcia*, 447 F.3d 1327, 1340 (11th Cir. 2006); *see also Zhenli Ye Gon v. Holt*, 774 F.3d 207, 219 (4th Cir. 2014).

Theory Two: The jury could conclude that Maya took the firearm with him to protect himself and his drugs during drug deals. While the evidence suggested that Maya typically kept his gun in his room, Meyers testified that Maya would "sometimes" have the gun with him while selling drugs. Specifically, Meyers answered "Yes" to the following question: "So [Maya] wasn't always selling drugs when he had the gun, but sometimes when he was selling drugs, he had the gun?" The jury also heard testimony that Maya considered it useful to have a firearm at drug deals. Meyers testified that Maya gave him money to buy a separate handgun so Meyers could have it at drug transactions, telling him "[i]t's my gun, but you can carry it." And Meyers had this second gun with him while picking up the BMW, a fact that would make it less important for Maya to have his own gun there.

This evidence, too, supports the jury's finding. "We have held consistently that possessing a gun as protection in the course of drug trafficking is sufficient to satisfy the 'in furtherance' element." *United States v. Reynolds*, 534 F. App'x 347, 361 (6th Cir. 2013) (citing cases).

Lastly, we must view these two theories "in the aggregate." *Ray*, 803 F.3d at 264. So we need not consider whether either theory alone would suffice. Together, they gave the jury enough evidence to find the "essential" in-furtherance-of element. *Jackson*, 443 U.S. at 319.

3

Maya's responses fall short. He starts with a divide-and-conquer approach to the *Mackey* factors, arguing that several were absent here and that the others alone do not suffice. Maya notes, for example, that he legally owned his handgun, that it is a type that homeowners use to

protect their homes, and that the police did not find drugs nearby. But none of these factors is dispositive. A legally owned gun can aid a drug-trafficking conspiracy. *See, e.g.*, *Adkins*, 429 F. App'x at 477–78; *United States v. Goins*, 93 F. App'x 675, 676 (5th Cir. 2004) (per curiam). And it is not surprising that drug dealers would protect their drug proceeds with the same types of weapons that homeowners would use to protect their homes. The relevant question for this sufficiency challenge is not whether the government proved more of the *Mackey* factors than it did not prove. Instead, the relevant question is whether a jury could rationally find that the defendant possessed the gun to aid the drug crime. And here, the evidence allowed a reasonable jury to find two theories under which Maya did so.

Maya thus turns to challenging those two theories. Starting with the first, he notes that we have never held that possession of a gun close to drug money (but not drugs or drug transactions) can suffice to show that a defendant possessed the gun "in furtherance of" a drug-trafficking crime. We agree that we do not have a case so holding. But we do not think it matters. Many cases from other circuits suggest (albeit often in dicta) that a defendant can violate this possession offense by using a gun to protect "drug proceeds" alone. *Shannon*, 715 F. App'x at 194; *see also, e.g.*, *Naranjo-Rosario*, 871 F.3d at 95. These cases make good sense. If a defendant uses a gun to protect the drug money needed to fund future illicit transactions, a jury could rationally conclude that the gun assisted the drug-trafficking conspiracy.

Turning to the second theory, Maya asks us to overlook Meyers's claim that Maya took his gun to drug deals on the ground that Meyers was not a "credible" witness. We agree that Maya presented plenty of evidence from which the jury could reject Meyers's testimony, including testimony from Maya's mother and brother that they regularly entered his room and saw his firearm there. But this conflicting evidence was for the jury to sort out. When reviewing a sufficiency challenge, we may not "judge[] the credibility of witnesses who testified at trial." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (citation omitted). Instead, we must accept Meyers's testimony as true at this stage. *See id.*

For both theories, Maya next argues that his case contains no more "in furtherance of" facts than the few cases in which we found the evidence insufficient. *See, e.g.*, *United States v.*

*Leary*, 422 F. App'x 502, 510–13 (6th Cir. 2011); *United States v. Nance*, 40 F. App'x 59, 66–67 (6th Cir. 2002); *see also United States v. Clemis*, 11 F.3d 597, 602 (6th Cir. 1993) (per curiam). But these cases do not help him. *Clemis* refused to uphold a conviction on the ground that a firearm was found next to drug proceeds (without any drug activity), but the court was interpreting the different offense of *using* a firearm during and in relation to a drug-trafficking crime. *See* 11 F.3d at 601–02; *cf. United States v. Riascos-Suarez*, 73 F.3d 616, 624 (6th Cir. 1996), *abrogated in part by Muscarello v. United States*, 524 U.S. 125 (1998). Because the jury convicted Maya of the *possession* offense that Congress enacted after *Clemis*, that case has little relevance here.

While *Leary* did involve the possession offense, its facts are far afield. The evidence in that case, we said, amounted to "nothing more than the fact that [three] guns were found in a duffel bag near a relatively small amount of drugs" and $448. *Leary*, 422 F. App'x at 505, 513. We contrasted these facts with situations in which a "defendant had actual possession of a gun while committing a drug-trafficking crime." *Id.* at 512. And we contrasted the facts with "situations in which there is a large amount of drugs *or money* present, such that the very existence of these items on the premises may be seen to warrant a gun for protection." *Id.* (emphasis added). Maya's case more closely fits the facts that *Leary* distinguished than the facts of *Leary* itself.

*Nance* also does not support Maya's argument. There, when the defendant was arrested for a domestic assault, the police found three guns in his car and 10.5 grams of crack cocaine, small amounts of other drugs, and $2,230 in cash on his person. *Nance*, 40 F. App'x at 61. We affirmed a district court's decision that this evidence fell short, noting that "the guns were in the car because [the defendant] was moving," not for any protective purpose. *Id.* at 67. And no evidence (other than the drugs and money) suggested that the defendant was engaging in any broad drug scheme. *Id.* Here, by contrast, the evidence allowed the jury to conclude that Maya had been participating in a largescale trafficking ring, that he occasionally took his gun to drug transactions, and that he kept it at his home to protect his substantial proceeds. At day's end, that evidence allowed a rational jury to find a nexus between his gun and his drug conspiracy. We thus see no legal basis for overturning Maya's conviction.

B

Alternatively, Maya argues that the district court mistakenly allowed Agent McKinley to testify about the "ultimate issue: the significance of the firearm's proximity to the money in Maya's room." Under our deferential abuse-of-discretion standard of review, "we will leave rulings about the admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached." *Cleveland*, 907 F.3d at 435–36 (citation omitted).

The district court did not abuse its discretion. Under Federal Rule of Evidence 702, "a person with 'specialized knowledge' qualified by his or her 'knowledge, skill, experience, training, or education' may give opinion testimony if it 'will assist the trier of fact to understand the evidence or determine a fact in issue.'" *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007) (quoting Fed. R. Evid. 702). A long list of cases permits experienced officers to give expert opinions about common practices of the drug trade so long as the testimony is relevant and reliable. *See, e.g.*, *id.*; *United States v. Cantrell*, 807 F. App'x 428, 434 (6th Cir. 2020); *United States v. Toland*, 717 F. App'x 560, 565–66 (6th Cir. 2017); *Swafford*, 385 F.3d at 1030; *Combs*, 369 F.3d at 940. Courts may permit this testimony even if it "embraces an ultimate issue to be decided by the trier of fact." *Johnson*, 488 F.3d at 699 (quoting Fed. R. Evid. 704(a)).

In this case, McKinley testified that he received "specialized training related to narcotics investigation" in the Indiana Law Enforcement Academy and the DEA Academy and that he had earned a master's degree that "dealt largely with narcotics." McKinley also spent nearly all of his 15-year career in law enforcement specializing in drug cases. During this time he had interviewed over a hundred people engaged in drug trafficking. Drawing on this training and experience, McKinley translated for the jury some drug-trafficking vernacular used by other witnesses and explained why he thought that several aspects of Maya's behavior were consistent with drug trafficking. His testimony largely comported with the testimony that we have upheld in other cases, telling "the jury what he saw and what it meant to him as viewed through the lens of his expertise." *Id.*

Maya raises two counterarguments. As a general matter, Maya argues that McKinley was not "even qualified to provide" expert testimony because "no foundation was laid for him to testify as an expert witness." If Maya means to suggest that the government should have asked the district court to certify McKinley as an expert, his argument fails for a legal reason: We have cautioned district courts not to declare a witness an expert in front of the jury. *Id.* at 697–98. If Maya means to suggest that the government failed to "pose qualifying and foundational questions" before seeking opinion testimony, *id.* at 698, his argument fails for a factual reason: The government did just that. Before seeking an opinion, it asked McKinley at least half a dozen questions about his training and experience. Either way, Maya's general challenge to McKinley's testimony fails.

As a specific matter, Maya challenges one exchange between the government and McKinley. After establishing that McKinley often must "distinguish between people who may possess a gun legitimately" and those "who possess guns in furtherance of drug trafficking," the government questioned McKinley about the "significance" of "the proximity of" the gun in Maya's bedroom "to $20,000 in cash and money orders." It asked: "What's that consistent with, from your training and experience?" McKinley answered: "That's consistent with the firearm being used to protect the funds. I don't believe they can be separated." This answer, Maya says, impermissibly told "the jury what legal conclusion to draw from the facts."

This specific challenge fails too. "We accord district courts a 'wide, but not unlimited, degree of discretion in admitting or excluding testimony [that] arguably contains a legal conclusion.'" *Volkman*, 797 F.3d at 388 (citation omitted). And courts may allow experts to "stat[e] opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue." *Id.* (citation omitted). We have, for example, affirmed a decision allowing experts to testify that there was no "legitimate medical purpose" for a drug prescription even though the charged crime also hinged on the "*legal* question of whether a prescription had a 'legitimate medical purpose[.]'" *See id.* at 388–90. If that testimony was not an abuse of discretion, neither was this testimony. McKinley expressed his opinion, informed by his training and experience, that the proximity of Maya's firearm to the proceeds of his drug conspiracy was "consistent with" Maya possessing it to

protect the funds.  While this opinion gave the jury information from which it could draw the conclusion that Maya had possessed a firearm "in furtherance of" a drug-trafficking conspiracy, McKinley did not opine on the legal significance of his opinion or use those words.  *See id.* at 388.  The district court thus did not abuse its discretion by overruling Maya's objection to this specific answer.

One final disclaimer.  An expert in a criminal case may not "state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."  Fed. R. Evid. 704(b).  Under this rule, we permit an expert to testify "in general terms" about "the common practices of those who clearly do possess the requisite intent" so long as the expert leaves "unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent."  *Combs*, 369 F.3d at 940 (citation omitted).  Maya does not argue that McKinley's answer violated Rule 704(b), so we need not resolve whether it permissibly stayed at the proper level of generality or impermissibly opined on Maya's own intent in possessing the gun. *Compare United States v. Harris*, 393 F. App'x 314, 318–19 (6th Cir. 2010), *with Combs*, 369 F.3d at 940.

We affirm.