NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0400n.06

No. 21-2826

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 12, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| DEONNE DOTSON, | ) | |
| Defendant-Appellant. | ) ) | OPINION |

Before: SUTTON, Chief Judge; DONALD and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. While serving as a Detroit police officer, Deonne Dotson repeatedly took bribes from the owner of a local auto body shop. In exchange, Dotson pressured Detroiters with damaged cars to use this body shop and filed false police reports facilitating the shop owner's insurance fraud. A jury convicted Dotson of six counts of Hobbs Act extortion.

Dotson challenges his convictions on three grounds. He first argues that the district court wrongly refused to question potential jurors about their racial biases during jury selection. Yet the court acted within its discretion by finding that Dotson's case did not raise a reasonable possibility that such biases could affect the verdict. Dotson next argues that the government wrongly relied on evidence of his gambling. Yet the overwhelming evidence of his guilt apart from his gambling allows us to avoid this evidentiary issue. Dotson lastly contends that the district court's jury instructions and the government's evidence confused extortion for bribery. Yet, for better or worse, the Supreme Court has long equated the two under the Hobbs Act. We thus affirm.

I

Norman Dehko inherited a Detroit auto body shop, Somerset Collision, from his father. Somerset repaired vehicles damaged by crashes, thefts, vandalism, and the like. Insurance companies typically paid for the repairs. In 2007, Dehko hatched a scheme to defraud these insurers by listing nonexistent repairs on the body shop's bills. The police caught up with Dehko five years later, at which time he pleaded guilty to insurance fraud and received a sentence of seven months in jail and five years of probation.

While on probation, Dehko continued in his old insurance-fraud ways. The police learned of his new round of misconduct. In February 2014, they obtained a search warrant to perform what Dehko later called a "raid" of Somerset.

This time, Dehko cooperated. He identified several officers in the Detroit Police Department's "abandoned vehicle task force" who were involved in his crimes. When officers in this task force came across a towable vehicle, department policy required them to arrange for the tow through a central dispatch. Yet rogue officers would quickly call Dehko and let him know that they had a vehicle for him. They would arrange for a tow directly to Somerset and attempt to convince the vehicle's owner to use this body shop. The officers might also file false police reports listing fake damage on the vehicle to facilitate the insurance fraud. Dehko paid officers about $1,000 for each referral and an extra $500 for a false police report.

According to Dehko, then-Officer Dotson began participating in this scheme around 2010 or 2011. Having joined the department in 2001, Dotson eventually became a member of the abandoned vehicle task force. Dehko alleged that Dotson had been making three to five referrals per month just before the search of Somerset.

A few months after this search, Dehko became a confidential FBI source. He agreed to continue accepting referrals from the six to eight suspected task-force officers. Now, however, the FBI would provide the funds for his bribes. The FBI also asked Dehko to secretly record his conversations with these officers.

Dehko's efforts implicated Dotson in the continued bribery scheme, a fact illustrated by their thirty-three recorded conversations. Dotson referred six vehicles to Dehko between May and September 2014, and Dehko paid him six times out of FBI-supplied funds. (Dotson denied taking any money, but we must recount the facts in the light most favorable to the government at this stage. *See United States v. Maya*, 966 F.3d 493, 496 (6th Cir. 2020).)

*Payment 1*: On May 19, a thief stole Carol Davenport's Lincoln MKZ. She found her car (without tires) a few blocks away. Davenport had it towed to Somerset. Dehko called Dotson to get him to complete a police report so that Somerset could collect the insurance. It turned out, however, that Davenport's brother owned the car. The registered owner had to sign the affidavit required for the police report. Dotson falsely stated in the report that Davenport's brother had reported the theft and signed the affidavit. Dehko paid Dotson $500 for this false report.

*Payment 2*: In the early hours of June 3, a thief stole Thonekhanh Amnath's Chrysler 300 outside a casino. The next day, Dotson alerted Amnath that the police had found her car without tires or a radio and with broken windows. Dotson suggested that she take her car to Somerset. He then mentioned the Chrysler to Dehko and provided him with Amnath's phone number. Dehko then called Amnath to convince her to use his shop. When Amnath got her car back, she realized that the thief had not really taken the radio because the "new" radio had her old stations still programmed into it. Dehko paid Dotson $1,300 for this referral.

3

*Payment 3*: On the morning of July 6, Dennal Bonds discovered that a thief had taken his Chrysler 300 from his mother's driveway. A couple days later, an acquaintance spotted this (now largely dismantled) Chrysler in a vacant house's backyard. Bonds called the police and headed to the house. When Dotson arrived, he told Bonds "I got a shop you can send it to." Bonds Tr., R.154, PageID 2314. Dotson also called Dehko to let him know that "I might have one, I'm about to make it right now." Dotson Tr., R.157, PageID 2853. Bonds had the car taken to Somerset, but the insurance company ultimately paid him for the car's value because it was a total loss. Dehko still gave Dotson $1,250 for the referral.

*Payment 4*: Later in July, Dotson convinced Dehko to front him $1,000 for a future referral because he needed vacation money. That referral came on August 12. After a rainy night, Calvin Ellis awoke to find his brand-new Ford Escape gone. The police found his car's "shell" that day. Ellis Tr., R.154, PageID 2366. Just before knocking on Ellis's door, Dotson let Dehko know that he might have a vehicle for the shop. According to Ellis, Dotson then told him that the police were taking the car to Somerset. *Id.*, PageID 2367. Ellis originally agreed to have Somerset fix his car but later had it towed to his dealer for the repairs.

*Payment 5*: When Maxine Langford and her longtime companion Vernard Wardlaw woke up on August 25, they found that someone had taken their new Chrysler 300. Langford's son saw their stripped car in a vacant field near their home. When they arrived there, Dotson had already beaten them to the scene. Although Wardlaw wanted the dealer to repair the Chrysler, Dotson said that the car would be shipped to Somerset. Dotson falsified the police records for this theft by stating that Langford had completed an affidavit. Dehko thus paid Dotson $1,600 for this referral.

*Payment 6*: On September 3, Dotson told Dehko that he would speak shortly with LaTanya Williams about her recovered Ford Fusion, which might be a referral candidate. Dotson put her

in contact with Dehko, who convinced her to tow her car to Somerset. Although Williams had her car repaired elsewhere, Dehko still paid Dotson $1,000.

A grand jury indicted Dotson on six counts of Hobbs Act extortion for these payments and on one count of Hobbs Act conspiracy for a similar scheme with another body-shop owner—all in violation of 18 U.S.C. § 1951(a). The jury issued a split verdict. It found Dotson guilty of each of the six acts of extortion with Dehko but acquitted him of the separate conspiracy with the other body-shop owner. The court sentenced Dotson to a total of 80 months' imprisonment.

II

Dotson raises three issues on appeal. He challenges the district court's refusal to ask questions about racial bias during jury selection. He challenges the admission of evidence about his gambling. And he challenges the sufficiency of the evidence and the jury instructions.

A. Jury Selection

Dotson criticizes the way in which the district court selected his jury. The court questioned the jury pool itself but allowed the parties to propose questions. Dotson, an African American, requested that the court ask potential jurors whether they believe that "white supremacy still continues in this country[.]" Req. Voir Dire, R.66, PageID 329. Dotson further requested that the court ask white members of the jury pool, among other questions, whether they believe that "our history and society including the justice system" have caused the racial disparities in the prison population and whether they have "ever used the 'N' word" or heard "a fellow-White person" use the word without objecting. *Id.* The court refused to ask these questions, which it described as "inappropriate, immaterial and inflammatory[.]" Tr., R.150, PageID 1686–87. It reasoned that Dotson's questions would "risk" "sensationalizing" a trial that otherwise "has absolutely nothing

5

to do with racial characteristics or animosities[.]" *Id.*, PageID 1687. According to Dotson, the court wrongly refused to ask potential jurors questions about racial prejudice.

To show why Dotson is mistaken, we begin with the legal ground rules. When viewed from our perspective on the appellate bench, Dotson's jury-selection claim implicates two principles that tug in different directions. The first principle has both constitutional and prudential roots: All courts should strive to ensure that defendants receive a fair trial in front of jurors who do not harbor improper biases. *See Mu'Min v. Virginia*, 500 U.S. 415, 422–24 (1991).

As a constitutional matter, the Sixth Amendment (incorporated by the Fourteenth Amendment against the states) gives defendants the right to an impartial jury. *See* U.S. Const. amend. VI. This right requires federal and state courts to ask potential jurors about racial prejudice if a case's "extraordinary racial tension" creates a risk that a juror's biases could affect the verdict. *Daniels v. Burke*, 83 F.3d 760, 766 (6th Cir. 1996); *see Rosales-Lopez v. United States*, 451 U.S. 182, 189–90 (1981) (plurality opinion). Yet such a constitutionally excessive risk does not automatically arise when a defendant of one race has harmed a victim of another. *See Ristaino v. Ross*, 424 U.S. 589, 596 n.8, 597–98 (1976). A defendant instead must point to something more concrete about the facts of the case. For example, the Constitution required a court to ask potential jurors about racial prejudice when the defendant—an African American civil-rights advocate— alleged that the police had framed him because of his civil-rights activities. *See Ham v. South Carolina*, 409 U.S. 524, 525–27 (1973). It also required a court to ask jurors about racial prejudice in the unique death-penalty context when an African American defendant faced a potential death sentence for murdering a white storekeeper. *Turner v. Murray*, 476 U.S. 28, 36–37 (1986).

As a prudential matter, the Supreme Court more thoroughly regulates jury selection in the federal courts using its "supervisory power" over the federal judiciary. *See Mu'Min*, 500 U.S. at

422; *cf. United States v. Tsarnaev*, 142 S. Ct. 1024, 1035–36 (2022). Exercising this power, the Court has told district courts that, as the "wiser course," they generally should ask potential jurors about racial bias when a defendant requests the inquiry. *Ristaino*, 424 U.S. at 597 n.9; *see Rosales-Lopez*, 451 U.S. at 191–92 (plurality opinion). Yet a court need not always ask such questions. Rather, we may reverse a district court for refusing to do so only if a "reasonable possibility" exists that racial bias could have affected the verdict. *Rosales-Lopez*, 451 U.S. at 191 (plurality opinion). If the government accuses a defendant of one race of engaging in a "violent crime" against a victim of another race, this possibility presumptively exists. *Id.* at 192; *see Aldridge v. United States*, 283 U.S. 308, 313–14 (1931). If, by contrast, the government accuses the defendant of a nonviolent crime, district courts have discretion to decide on a "case-by-case" basis whether the possibility exists. *Rosales-Lopez*, 451 U.S. at 192 (plurality opinion); *United States v. Tocco*, 200 F.3d 401, 411–13 (6th Cir. 2000); *cf. United States v. Borders*, 270 F.3d 1180, 1183 (8th Cir. 2001); *United States v. Barber*, 80 F.3d 964, 967–70 (4th Cir. 1996); *United States v. Brown*, 938 F.2d 1482, 1485–86 (1st Cir. 1991).

This fact leads us the second principle that we must respect: District courts on the front lines of jury trials—not circuit courts viewing things after the fact—have the primary duty to ensure an impartial jury. *See Rosales-Lopez*, 451 U.S. at 189 (plurality opinion). Like the jury evaluating witnesses during the trial itself, the trial court at the jury-selection stage must watch, and assess the honesty of, potential jurors while they respond to live questioning in real time. *See id.* Given the nature of this task, the Supreme Court has long provided trial courts with broad discretion over how to manage it. *Tsarnaev*, 142 S. Ct. at 1034; *Ristaino*, 424 U.S. at 594.

As in Dotson's case, district courts commonly exercise this discretion by examining prospective jurors themselves rather than asking the parties' counsel to do so. *See* Fed. R. Crim.

7

P. 24(a)(1); 2 Charles A. Wright & Peter J. Henning, *Federal Practice and Procedure* § 380, at 564 (4th ed. 2009). A court that handles the jury selection must give the parties the chance to submit additional questions, but the court need only ask the proposed questions that it "considers" "proper." Fed. R. Crim. P. 24(a)(2)(B). The Federal Rules of Criminal Procedure, in other words, make clear that the district court's general discretion over jury selection includes the specific discretion to pick the questions to ask a pool of potential jurors. *See Tsarnaev*, 142 S. Ct. at 1036.

This allocation of authority matters on appeal. We may reverse a district court for failing to ask a particular question only if the court's failure amounts to an abuse of discretion. *See id.* at 1034. That deferential standard means that cases will arise in which we cannot say that the district court committed reversible error even though we might have asked the defendant's proposed questions if we had conducted the jury selection ourselves. *See, e.g.*, *Tocco*, 200 F.3d at 412–13.

Against this legal backdrop, Dotson has established neither error under the Constitution nor error under the Supreme Court's supervisory-power instructions. To begin with, Dotson has not shown that this case involved any racial tensions, let alone the type of "extraordinary" tensions necessary for the Constitution to require a trial court to ask potential jurors about racial prejudices. *Daniels*, 83 F.3d at 766; *cf. Ristaino*, 424 U.S. at 597–98. Nor did the Court's supervisory-power directions automatically require these questions. This case involved public-corruption crimes, not "violent" ones. *Rosales-Lopez*, 451 U.S. at 192 (plurality opinion).

These conclusions leave Dotson with the argument that, under all of the circumstances, a "reasonable possibility" existed that racial prejudice might have affected his verdict. *Cf. id.* at 193. For three reasons, though, the district court's contrary finding did not abuse its discretion.

*First*, Dotson identifies no non-speculative reason why a juror might have viewed his public-corruption case through a "racial" lens. *United States v. Walker*, 491 F.2d 236, 239 (9th

Cir. 1974). To suggest that possibility, Dotson points to the fact that he is African American, whereas Dehko and the other body-shop owner alleged to have conspired with Dotson are not. Yet these body-shop owners were not traditional "victims," so this case does not involve the type of interracial crimes that might heighten racial tensions. *Cf. Rosales-Lopez*, 451 U.S. at 192 (plurality opinion); *Ristaino*, 424 U.S. at 597–98. Rather, Dehko and the other owners were alleged to be knowing accomplices. *Cf. Ocasio v. United States*, 578 U.S. 282, 287–92 (2016). If anything, Dotson's victims were the vehicle owners whom he steered to Somerset. They provided plenty of incriminating evidence against him. Notably, however, Dotson does not identify their races, let alone claim that their races might have influenced the jury. In these circumstances, any "racial or ethnic differences" between Dotson and the body-shop owners, the "key Government witness[es]," do not establish a reasonable possibility of an improperly biased verdict. *Rosales-Lopez*, 451 U.S. at 193–94 (plurality opinion). Indeed, the "jury saw fit" to acquit Dotson on the conspiracy charge involving the other body-shop owner. *Brown*, 938 F.2d at 1485.

*Second*, when a defendant cannot point to a case-specific reason why a district court needs to ask about racial bias, appellate courts have held that a district court does not abuse its discretion by making "general inquiries" about improper bias during jury selection. *Borders*, 270 F.3d at 1184; *see United States v. Diaz*, 854 F. App'x 386, 387–90 (2d Cir. 2021) (order); *Brown*, 938 F.2d at 1485–86. The district court undertook such an inquiry here. It warned the jury pool at the outset that courts expect jurors to be free from "improper bias" and "improper prejudice[.]" Tr., R.151, PageID 1720–21. It later asked potential jurors whether any of them had "any other reason" why they "may not be able to be a fair and impartial juror[.]" *Id.*, PageID 1809.

*Third*, the "form" of Dotson's proposed questions makes the district court's rejection of them understandable. *Turner*, 476 U.S. at 37. Dotson did not want the court to conduct a discrete

inquiry into racial prejudice. He wanted the court to ask about the prevalence of "white supremacy" in the country, how structural racism affects the justice system, and the use of racial slurs. Req. Voir Dire, R.66, PageID 329. The court could reasonably conclude that these questions would risk "sensationalizing" the trial, Tr., R.150, PageID 1687, and counterproductively "heighten" (rather than minimize) the "role" of race in the "decisionmaking process," *Barber*, 80 F.3d at 967–68; *see also Rosales-Lopez*, 451 U.S. at 190 (plurality opinion).

Dotson counters that the persistence of racism in America necessitated questioning the potential jurors on racial bias. The Supreme Court has rejected that view. It has long admonished courts that they must begin with "no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." *Tocco*, 200 F.3d at 413 (quoting *Rosales-Lopez*, 451 U.S. at 190 (plurality opinion)). So general concerns about bias do not provide grounds for an appellate court to second-guess a trial court in its evaluation of the case-specific risks of bias. *Cf. United States v. Escobar-de Jesus*, 187 F.3d 148, 165–66 (1st Cir. 1999).

## B. Gambling Evidence

Dotson next challenges the admission of evidence about his gambling. Before trial, the district court denied his motion to exclude this evidence, reasoning that his gambling habit was relevant (because it showed his motive for taking money from Dehko) and not unduly prejudicial (because "[g]ambling is a legal and common pastime"). Order, R.68, PageID 341–42. At trial, a Greektown Casino employee testified about Dotson's gambling by introducing the casino's records of his "player's card" usage. This evidence suggested that Dotson visited the casino shortly after each of the six times that he took money from Dehko in 2014. It also indicated that he visited the casino 163 times in 2014 even though other evidence showed that he made less than $50,000 that year as a police officer. Dotson now argues that his gambling history was irrelevant under

Federal Rule of Evidence 401, that it was unduly prejudicial under Rule 403, and that it qualified as inadmissible "prior acts" evidence under Rule 404(b).

Ultimately, we need not resolve these evidentiary issues. Even assuming that the federal rules did not permit this evidence, the district court would have committed only a harmless error by admitting it. A district court's mistaken evidentiary ruling does not warrant a new trial when the error did not affect a defendant's "substantial rights." Fed. R. Crim. P. 52(a). For the government to show the harmless nature of a non-constitutional error, we have sometimes stated that the government must prove that it is more likely than not that the error did not change the verdict. *See United States v. Kettles*, 970 F.3d 637, 643 (6th Cir. 2020). Other times, we have stated that the government must create a "fair assurance" that the error would not have "substantially swayed" the jury. *Id.* (citation omitted); *see Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *United States v. Christian*, 925 F.3d 305, 314 (6th Cir. 2019) (en banc). The two standards may (or may not) convey the same basic idea. *See Kettles*, 970 F.3d at 644–45, 644 n.4. Yet we need not consider whether daylight exists between them. Measured under either standard, Dotson's gambling habits would not have mattered to the outcome. *Cf. id.* at 645.

Most obviously, as in many other cases in which we have found an error harmless, the government presented "overwhelming" evidence that Dotson took money from Dehko on the six occasions underlying his six convictions. *See, e.g.*, *id.*; *United States v. Dimora*, 750 F.3d 619, 628–29 (6th Cir. 2014); *cf. United States v. Addario*, 662 F. App'x 61, 63–64 (2d Cir. 2016) (order) (finding gambling evidence harmless); *United States v. Swan*, 250 F.3d 495, 501 (7th Cir. 2001) (same). Dehko, a confidential FBI informant, described in detail each of his six payments to Dotson and the reasons for the payments. Substantial "corroborative evidence" reinforced Dehko's directly incriminating testimony. *Kettles*, 970 F.3d at 645. As the prosecution noted in

closing, "Dotson essentially convict[ed] himself" in the thirty-three recorded conversations with Dehko. Tr., R.157, PageID 2932. The FBI agent in charge of the investigation likewise explained the meticulous manner in which he recorded the transfer of funds to Dehko for his use in bribing Dotson.

But that is not all. Most of the vehicle owners testified about the ways in which Dotson kept his end of the deal by pressuring them to use Somerset Collision or by falsifying police reports. As Carol Davenport explained with respect to the first payment, she called the police about her stolen Lincoln, but Dotson falsely stated on the police report that her brother (the registered owner) had done so. Her brother confirmed that he had never spoken to Dotson about the car despite what the police report said. Or as Calvin Ellis explained with respect to the fourth payment, Dotson gave him no choice but to tow his Ford to Somerset: "the officer told me that that's where they were going to take it and that's . . . where it went." Ellis Tr., R.154, PageID 2367.

The gambling evidence, by comparison, played a minor supporting role when viewed in the context of "all else that happened" at trial. *Kotteakos*, 328 U.S. at 764. The presentation of the gambling evidence takes up only 40 of the roughly 800 pages of transcript for the government's case-in-chief, and the prosecution spent about one page of a 35-page closing argument on this evidence. And it was unlikely that the mere mention of the evidence would automatically turn jurors against Dotson for emotional reasons. Unlike, say, the government's use of a defendant's racist and sexist comments that are "antithetical to the sensibilities of decent people," *United States v. Hazelwood*, 979 F.3d 398, 415 (6th Cir. 2020), the government relied on evidence showing only that Dotson was engaged in lawful, common entertainment. For this reason, courts often hold that gambling evidence would not unduly prejudice a party (and thus that its introduction would

not even qualify as error when it is otherwise relevant). *See, e.g.*, *United States v. Blanchard*, 618 F.3d 562, 570 (6th Cir. 2010); *United States v. Jackson-Randolph*, 282 F.3d 369, 379–80 (6th Cir. 2002); *United States v. Shrum*, 655 F.3d 782, 786 (8th Cir. 2011). Lastly, the jury's acquittal of Dotson on the conspiracy charge reinforces that it carefully picked through the evidence and did not get swept up in improper passions due to his gambling. *Cf. United States v. Phillips*, 872 F.3d 803, 810–11 (6th Cir. 2017).

### C. Jury Instructions and Sufficiency of the Evidence

For three decades, the Supreme Court has held that Hobbs Act extortion includes bribery. *See Evans v. United States*, 504 U.S. 255, 260 (1992). Dotson argues that a recent decision, *McDonnell v. United States*, 579 U.S. 550 (2016), overruled this view. He argues both that the jury instructions in his case conflicted with *McDonnell* and that the evidence did not satisfy its revised standards. Dotson's claims fail because he overreads that decision.

1

Because Dotson's jury-instruction and evidence-sufficiency claims turn on the meaning of the Hobbs Act, we start with its elements. The Hobbs Act imposes punishment on anyone who "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion[.]" 18 U.S.C. § 1951(a). The Act goes on to define "extortion" to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). Here, Dotson did not acquire money from Dehko by the use of force, violence, or fear, so the government needed to convince the jury that he did so "under color of official right." *Id.*

The phrase "under color of official right" has an established—if controversial—meaning dating back to *Evans*. All agree that this phrase narrowly covers the "well-recognized" situation

13

in which a public officer falsely says that the law requires a victim to give the officer money when, in fact, the officer has no legal right to the payment. *Evans*, 504 U.S. at 269; *see id.* at 280–84 (Thomas, J., dissenting). This type of extortion did not occur in this case, however, because Dotson made no claim that he had a right to Dehko's money.

Yet *Evans* held that this view did not exhaust the ways in which an officer could extort a victim. Under *Evans*, an officer also obtains money "under color of official right" if the officer's conduct looks like "what we would now describe as 'taking a bribe.'" *Id.* at 260. An officer thus commits extortion if the officer takes money in exchange for an "agreement to perform specific official acts" when the officer has no right to collect that "fee." *Id.* at 268, 270. In other words, a "*quid pro quo*" (money in exchange for an "official act") violates the Hobbs Act. *McCormick v. United States*, 500 U.S. 257, 273–74 (1991); *see Ocasio*, 578 U.S. at 296–97.

Because *Evans* subjects an officer to liability for taking money in exchange for "official acts," its holding raises an important question: What qualifies as an "official act" under the Hobbs Act (which does not use that phrase)? The Supreme Court's decision in *McDonnell* implicates this question. There, the government charged a former Virginia governor with Hobbs Act extortion for receiving "over $175,000 in gifts and loans" from a CEO who sought the governor's help in getting Virginia universities to conduct a research study of his company's nutritional supplement. 579 U.S. at 561–62. In exchange for the money, the governor allegedly arranged for official meetings, hosted official events, and made official phone calls, but he did not order or pressure any state officers to agree to the study. *Id.* at 559, 563–64. The parties in *McDonnell* agreed that *Evans*'s "official act" element for Hobbs Act extortion incorporated a separate federal bribery statute's definition of "official act." *Id.* at 562–63. This bribery statute defined "official act" to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy,

14

which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3).

Applying this definition, the Court in *McDonnell* established a two-part test for an "official act." The government must first prove that a "question" or "matter" came before a public-official defendant (or could have by law come before the defendant). *McDonnell*, 579 U.S. at 567 (quoting 18 U.S.C. § 201(a)(3)). The government then must prove that the defendant "made a decision or took an action 'on'" this question or matter. *Id.* (quoting 18 U.S.C. § 201(a)(3)). The Court held that an official meeting, call, or event does not itself typically qualify as an independent "question" or "matter" separate from the *subject* of the meeting, call, or event (for example, the research study in *McDonnell* itself). *Id.* at 569. The Court next held that merely arranging a meeting, making a call, or organizing an event about a "matter"—as the governor allegedly did with respect to the research study—also did not qualify as a decision or action *on* the matter. *Id.* at 571–72. The prosecution instead has to show more—for example, that the governor in *McDonnell* accepted or rejected the research study or that he pressured other state officers to accept or reject it. *Id.* at 572.

2

Although *McDonnell* rested on the parties' case-specific concession that the bribery statute's definition of "official act" extended to the Hobbs Act (which, again, does not use that phrase), we have applied *McDonnell* in Hobbs Act cases more generally. *See, e.g.*, *United States v. Hills*, 27 F.4th 1155, 1177–79 (6th Cir. 2022); *United States v. Henderson*, 2 F.4th 593, 599-600 (6th Cir. 2021); *Dimora v. United States*, 973 F.3d 496, 502–05 (6th Cir. 2020) (per curiam). Dotson and the government thus agree that *McDonnell* provided the proper framework for this case. They disagree over whether Dotson's trial satisfied it.

*Jury Instructions*.  Dotson initially argues that the jury instructions failed to adequately account for *McDonnell*.  But he did not preserve this objection in the district court, so we review it only for plain error.  *See United States v. Semrau*, 693 F.3d 510, 527 (6th Cir. 2012); *see also United States v. Hatton*, 643 F. App'x 574, 580–81 (6th Cir. 2016).  Under our precedent, the plain-error test in this context requires a defendant to show that the collective instructions so obviously misstated the law that the resulting conviction creates a "grave miscarriage of justice."  *Semrau*, 693 F.3d at 528 (citation omitted); *see United States v. Piccolo*, 723 F.2d 1234, 1241 (6th Cir. 1983) (adopting this test).

We see no obvious misstatement of law.  Indeed, the district court relied on our pattern instructions for Hobbs Act extortion.  *Cf.* Pattern Crim. Jury Instr. 6th Cir. Ch. 17.02 (Oct. 1, 2021).  The court's instructions identified the basic elements under *Evans*, including that Dotson must have known that "the property" that he took from Dehko "was being accepted in exchange for an official act."  Tr., R.157, PageID 2910.  The instructions also defined "official act" using *McDonnell*'s two-part test.  *Id.*, PageID 2911.  And they contained additional "clarifying" guidance that we have since suggested, *Dimora*, 973 F.3d at 503, including that "setting up a meeting, calling another public official, or hosting an event does not" suffice on its own, Tr., R.157, PageID 2911.

In truth, Dotson's jury-instruction argument itself rests on an obviously mistaken view of *McDonnell*.  He argues that his instructions wrongly equated extortion with bribery.  But *Evans* adopted this very connection thirty years ago.  504 U.S. at 260.  And contrary to Dotson's claim, *McDonnell* did not overrule *Evans* and replace it with Justice Thomas's narrower view of the Hobbs Act.  *See Evans*, 504 U.S. at 280–84 (Thomas, J., dissenting).  *McDonnell* clarified only what qualifies as an "official act" under the bribery statute, 18 U.S.C. § 201(a)(3).

Dotson's other instructional argument suffers from a similar flaw. He suggests that the court should have instructed the jury that it must find that he obtained money from Dehko "by wrongful use of actual or threatened force, violence, or fear[.]" 18 U.S.C. § 1951(b)(2). This case, however, involved the second part of the Hobbs Act's definition of extortion: extortion "under color of official right[.]" *Id.* The court thus had no reason to instruct the jury on a distinct type of extortion that played no part in the litigation.

*Sufficiency of the Evidence*. Dotson alternatively argues that the evidence did not suffice to establish Hobbs Act extortion after *McDonnell*. To preserve this sufficiency challenge, Dotson should have moved for a judgment of acquittal at the end of the prosecution's case-in-chief and again at the close of the evidence. *United States v. Sease*, 659 F.3d 519, 522 (6th Cir. 2011). And if he raised a specific ground for a judgment of acquittal at trial, we generally will not consider other non-raised grounds on appeal. *See United States v. Hamm*, 952 F.3d 728, 740 (6th Cir. 2020). Yet Dotson sought a directed verdict at the close of the government's case on a distinct ground applicable only to a single count, and he did not even renew that narrow request at the close of the evidence. It is thus not clear that we should review this claim at all. *See id.* At the least, Dotson's forfeiture requires him to establish that the trial record is so "devoid of evidence" that an objective observer could describe an appellate decision upholding his convictions as a "manifest miscarriage of justice." *United States v. Woods*, 14 F.4th 544, 555 (6th Cir. 2021) (citation omitted); *see United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) (borrowing "devoid of evidence" test from the Fifth Circuit); *United States v. Faymore*, 736 F.2d 328, 334 (6th Cir. 1984) (adopting "manifest miscarriage of justice" test); *cf. United States v. Burris*, 999 F.3d 973, 976–78 (6th Cir. 2021).

17

Dotson cannot satisfy this demanding test. He argues that, like the governor in *McDonnell*, he merely arranged meetings between Dehko and vehicle owners and so never took an "action" on a "matter" within the meaning of that case's "official act" test. We need not decide whether Dotson is correct that arranging these types of meetings alone would have sufficed to show an "official act." The evidence allowed the jury to conclude that Dotson did far more than set up calls between vehicle owners and Dehko "to talk about" repairs. *McDonnell*, 579 U.S. at 573. The evidence, for example, showed that he falsified police reports during at least two of the six referrals. And Dotson does not argue that falsifying reports would fall outside *McDonnell*'s test (so we need not decide that issue). *Cf. Hills*, 27 F.4th at 1178–79; *Henderson*, 2 F.4th at 599–600.

Likewise, Dotson does not argue that pressuring vehicle owners to tow their vehicles to Somerset—or making that towing decision himself without their consent—would fall outside *McDonnell*'s test (and so we need not decide that issue either). *Cf. Ocasio*, 578 U.S. at 284–85; *United States v. Chastain*, 979 F.3d 586, 591–92 (8th Cir. 2020). Here too, the jury could have reasonably found that Dotson engaged in these types of pressure tactics. Dennal Bonds testified, for example, that Dotson told Dehko over the phone that "I got a car coming to you" when discussing Bonds's Chrysler and arranged for a tow truck to take the car to Somerset without any real input from Bonds himself. Bonds Tr., R.154, PageID 2314–15. As noted, other vehicle owners testified similarly. *See, e.g.*, Ellis Tr., R.154, PageID 2367; Langford Tr., R.155, PageID 2396. So the trial record is teeming with—not "devoid" of—evidence showing Dotson's guilt. *Woods*, 14 F.4th at 555 (citation omitted).

\*  \*  \*

As Dotson correctly notes, Justices and commentators alike have criticized *Evans*'s broad interpretation of the Hobbs Act on the ground that it confuses bribery for extortion. *See Silver*

*v. United States*, 141 S. Ct. 656, 656–57 (2021) (Gorsuch, J., dissenting from denial of certiorari).

But he is making this pitch to the wrong entity. As a lower court, we must follow that interpretation

until the Supreme Court tells us otherwise. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

We affirm.