UNITED STATES of America, Plaintiff–Appellee,

v.

Durand SINCLAIR, Defendant–Appellant.

No. 14–2624.

United States Court of Appeals, Sixth Circuit.

Nov. 24, 2015.

Before: SILER, MOORE, and GIBBONS, Circuit Judges.

## OPINION

KAREN NELSON MOORE, Circuit Judge.

Defendant–Appellant Durand Sinclair appeals the district court's denial of his motion to suppress a firearm seized from his residence. Sinclair argues that the affidavit in support of the search warrant lacked probable cause because the affidavit failed to establish a nexus between the illegal activity and the residence to be searched and because the information in the affidavit was stale. Sinclair also contends that the good-faith exception to the exclusionary rule does not apply. For the reasons discussed below, we **AFFIRM** the district court's denial of the motion to suppress.

## I. BACKGROUND

### A. The Affidavit and Search

On April 2, 2013, a Michigan state-court judge issued a search warrant to search two premises: a two-story house on Pasadena in Highland Park, Michigan, and a two-story house on Snowden in Detroit, Michigan. R. 21–2 (Aff. at 1) (Page ID # 107). The search warrant was supported by the affidavit of Detective Richard Cooper, a member of the Highland Park Police Department assigned to the FBI's Violent Crime Task Force, who then had seven years of police experience. *Id.* at 3 (Page ID # 109). Detective Cooper's affidavit set out the following facts.

On March 4, 2012, a confidential source (CS1) disclosed that he or she had been purchasing heroin from "Durand" for several years. *Id.* CS1 explained that he or she contacts a telephone number and is then directed to the address on Pasadena in Highland Park. *Id.* Officers identified Durand Sinclair as the individual involved in the narcotic sales. *Id.* at 4 (Page ID # 110). As the affidavit provides, the FBI previously investigated Sinclair in 2008 for selling narcotics at a different Pasadena address. *Id.* The 2008 investigation "revealed that Sinclair would store narcotics at his residence and make daily deliveries" to the Pasadena address. *Id.*

In July 2012, law enforcement began surveillance on the Pasadena address described by CS1. *Id.* Officers and agents

conducted surveillance on eight occasions from July through November 2012. *Id.* During this investigation, agents stopped individuals leaving the Pasadena address and made arrests for possession of illegal narcotics. *Id.* The affidavit states that officers observed Sinclair parking a vehicle near the Pasadena address and entering the house "numerous times." *Id.*

Officers and agents also conducted surveillance on the Snowden address in Detroit, which the affidavit describes as Sinclair's residence. On November 16, 2012, the affidavit states that officers observed the "subject vehicle in front [of Sinclair's] residence" on Snowden. *Id.* On November 26, 2012, law enforcement observed Sinclair leaving the Snowden address. *Id.* The officers followed him from the Snowden residence to the address on Pasadena, noting that Sinclair was "see[ing] if he was being followed by circling and making frequent turns." *Id.*

Months later, on March 5, 2013, officers again observed Sinclair "depart his residence" on Snowden in a green BMW, and "return using a key to gain entry into the residence." *Id.* Agents simultaneously observed the house on Pasadena, noting that "no one was observed visiting or conducting narcotics transaction" on Pasadena during the time that Sinclair was on Snowden. *Id.* The next day, on March 6, 2013, officers observed the green BMW parked on Pasadena and saw Sinclair enter the Pasadena address. *Id.* Over the course of the next several hours, numerous individuals arrived and "stayed no more than a few minutes and then left ... consistent with narcotic trafficking." *Id.* at 4–5 (Page ID # 110–11). On March 9, 2013, officers stopped a car leaving the Pasadena address and found a plastic baggie of heroin. *Id.* at 5 (Page ID # 111).

On March 18, 2013, officers again conducted surveillance on the Snowden and Pasadena residences. *Id.* At 3:55 p.m., officers observed Sinclair arrive at the Snowden residence in a white Chevrolet van and use a "key to unlock the front door." *Id.* Officers on Pasadena observed no activity at the Pasadena address "between the hours of 8:00 a.m. and 6:10 p.m." *Id.* At 6:10 p.m., officers saw the white Chevrolet van parked on Pasadena. According to the affidavit, "[d]uring the next hour ... 11 people arrived" and stayed "between one and five minutes," consistent with narcotics trafficking. *Id.* On March 22, officers stopped a woman leaving the Pasadena address and found crack cocaine. *Id.* On March 31, officers stopped a male leaving the Pasadena address and again discovered crack cocaine. *Id.* Sinclair "was observed on Pasadena during the time of narcotic sales" on March 31. *Id.*

Detective Cooper provided that, based upon his "training, experience and participation in investigations involving controlled substance violations," he believed several items of evidence would be found in the locations to be searched, including large amounts of currency, records and ledgers, controlled substances, firearms, computer records, and other documents. *Id.* at 5–6 (Page ID # 111–12). Officers executed the search warrant on April 3, 2013. R. 1 (Crim. Compl. at 5) (Page ID # 5). Sinclair was arrested inside of the Pasadena address. *Id.* At the Pasadena address, officers seized drugs and drug paraphernalia. *Id.* at 5–6 (Page ID # 5–6). At the Snowden address, officers found over two-thousand dollars in cash, a shotgun, shotgun shells, and a utility bill in Sinclair's name. *Id.* at 5 (Page ID # 5).

## B. Procedural History

On October 17, 2013, Sinclair was charged with one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). *Id.* at 1 (Page ID # 1). A

grand jury indicted Sinclair on November 12, 2013. R. 10 (Indictment at 2) (Page ID # 51).

On January 24, 2014, Sinclair moved to suppress the evidence obtained from the Snowden residence. R. 21 (Mot. to Suppress) (Page ID # 90). Sinclair argued that although the affidavit detailed a "cornucopia" of drug activity at the Pasadena address, the affidavit did not justify a warrant to search the Snowden address because it failed to establish a nexus between the drug activity on Pasadena and the Snowden residence. *Id.* at 6–7 (Page ID # 95–96); *see also id.* at 13 (Page ID # 102). In his reply brief, Sinclair further argued that the search warrant failed to establish probable cause because it did not allege that Sinclair "owned, rented, or otherwise had some equitable interest in the Snowden address." R. 25 (Reply Mot. to Suppress at 8) (Page ID # 151). Rather, the only allegation in the affidavit as to proof of residence is that Sinclair used a key to enter. *Id.* Sinclair's reply further argued for the first time that the warrant was invalid because it was stale. *Id.* at 9 (Page ID # 152). According to Sinclair, the affidavit's "last mention of the Snowden address" was March 18, 2013, and the search warrant was not issued until April 2, 2013. *Id.* at 10 (Page ID # 153). Because "information goes stale very quickly" for drug crimes, Sinclair argued that probable cause no longer existed to search the Snowden address when the warrant was issued. *Id.* at 11 (Page ID # 154) (emphasis omitted).

The district court denied Snowden's motion to suppress on June 13, 2014. R. 31 (Dist. Ct. Order at 10) (Page ID # 191). The district court relied on this Circuit's precedent in *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir.2005), and *United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir.2002), to hold that "status as a drug dealer, plus the observation of drug activity in other places is sufficient to establish probable cause to search the home." R. 31 (Dist. Ct. Order at 5) (Page ID # 186). The district court found that the affidavit established probable cause that evidence would be found at the Snowden residence because the officers followed Sinclair from Snowden to Pasadena, observed him at the Pasadena address, and because Sinclair is a "known drug dealer." *Id.* at 7–8 (Page ID # 188–89). The court also addressed Sinclair's staleness argument, even though it was raised for the first time in his reply brief. *Id.* at 8 (Page ID # 189). The court found that the affidavit was not stale because the defendant was "entrenched in the Detroit area," his residence "could be considered a secure operational base," and the affidavit set forth an "ongoing criminal investigation." *Id.* at 9–10 (Page ID # 190–91).

Sinclair entered a conditional guilty plea on June 24, 2014, R. 36 (Plea Agreement) (Page ID # 204), and judgment was entered on December 16, 2014. R. 49 (Judgment) (Page ID # 270). Sinclair appealed the denial of his motion to suppress on December 29, 2014. R. 48 (Not. of Appeal at 1) (Page ID # 269).

## II. ANALYSIS

### A. Standard of Review

"In appeals from a district court's ruling on a motion to suppress evidence, we review the trial court's factual findings for clear error and its legal conclusions de novo." *Frazier*, 423 F.3d at 531. "The standard of review for determining the sufficiency of the affidavit is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir.2003) (internal quotation marks omit-

ted). We afford "great deference" to the issuing judge's determination of probable cause. *Id.*

## B. Probable Cause

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. In deciding whether an affidavit establishes probable cause, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Sinclair contends that officers lacked probable cause to search the Snowden residence because the affidavit was stale and because the affidavit failed to establish a nexus between the trafficking activity on Pasadena and the Snowden residence.

### 1. Staleness

■ We agree with the district court that the information contained in the affidavit was not stale. According to the affidavit, Sinclair was last observed at the Snowden address on March 18, 2013, fifteen days before the warrant was issued on April 2, 2013. R. 21–2 (Aff. at 5) (Page ID # 111). Whether information in an affidavit is stale depends on "the specific circumstances in each case." *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir.2006). We consider several factors to determine whether information in an affidavit is stale, including "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), [and]

the place to be searched (mere criminal forum of convenience or secure operational base?)." *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir.1998) (quotations omitted).

Each of these factors weighs against a finding of staleness. First, the nature of Sinclair's crime was "an ongoing drug trafficking conspiracy." *See United States v. Brown*, 801 F.3d 679, 690 (6th Cir.2015). CS1 detailed to officers that he or she had purchased heroin from Sinclair "for several years," and officers subsequently observed Sinclair's activity over the course of a year. R. 21–2 (Aff. at 3–4) (Page ID # 109–10). "Evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir.2001). Second, the ongoing nature of the criminal activity described in the affidavit, and Sinclair's previous drug-related activity on Pasadena in 2008, suggests that Sinclair was "entrenched" in the Detroit area rather than "nomadic." *See* R. 21–2 (Aff. at 3–4) (Page ID # 109–10). Third, the items to be seized in the search warrant included nonperishable items such as firearms, business records, and drug paraphernalia. *Id.* at 1 (Page ID # 107). Finally, because officers observed Sinclair at Snowden on four separate occasions over the course of a year-long investigation, and observed him using a key to gain entry, the Snowden address is closer to a "secure operational base" rather than a "mere criminal forum of convenience." *Spikes*, 158 F.3d at 923; *see* R. 21–2 (Aff. at 4–5) (Page ID # 110–11). Accordingly, the fifteen-day span between the officers' last observation of Sinclair on Snowden and the issuance of the affidavit is not sufficient to defeat probable cause.

### 2. Nexus

It is a closer question, however, whether Detective Cooper's affidavit established a

sufficient nexus between the Snowden address and the illegal activity on Pasadena. An affidavit in support of probable cause must demonstrate that there is "a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.2004) (en banc) (quotations omitted). Specifically, "the affidavit must suggest 'that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of the property is suspected of a crime.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir.2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)).

In upholding the search of the Snowden address, the district court relied on our previous decisions establishing that, in some circumstances, an issuing magistrate may reasonably infer that the residence of a "known drug dealer" will contain evidence of ongoing drug activity. R. 31 (Dist. Ct. Order at 5) (Page ID # 186) (citing *Frazier*, 423 F.3d at 533; *Miggins*, 302 F.3d at 393–94); *see also United States v. Berry*, 565 F.3d 332, 339 (6th Cir.2009); *United States v. Jones*, 159 F.3d 969, 974–75 (6th Cir.1998). Although Sinclair acknowledges that this inference may be drawn in some circumstances, he argues that it is inappropriate here because Detective Cooper's affidavit "failed to establish that [Sinclair] ever resided at the Snowden address." Appellant Br. at 10. Rather, the affidavit merely describes Snowden as Sinclair's "residence" and details that officers saw the same vehicle outside of Snowden and Pasadena, that officers observed Sinclair leaving the address on Snowden and subsequently followed him to Pasadena, and that officers twice witnessed Sinclair use a key to gain entry into the Snowden residence. R. 21–2 (Aff. at 4–5) (Page ID # 110–11). Sin-

clair argues that the officers' observations of Sinclair on Snowden are just as consistent with the Snowden address being the home of Sinclair's relative or friend. Appellant Br. at 15. According to Sinclair, because no illegal activity was observed at the Snowden house and because the affidavit failed to establish that Sinclair actually resided at the house, the issuing judge could not infer that evidence of illegal drug activity would likely be found at the Snowden residence.

We need not decide, however, whether these observations are sufficient on their own to establish that Sinclair resided at Snowden such that the issuing judge had a substantial basis to infer a nexus between the Snowden and Pasadena residences. Because we conclude "that the good-faith exception clearly applies, we will assume without deciding that probable cause did not exist" to search the Snowden address. *United States v. Washington*, 380 F.3d 236, 240 (6th Cir.2004).

### C. Good–Faith Exception

Because the purpose of the exclusionary rule is to deter Fourth Amendment violations, "[c]ourts should not ... suppress 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'" *Carpenter*, 360 F.3d at 595 (quoting *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). There are four circumstances, however, in which *Leon*'s good-faith exception is inapplicable:

(1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false ...; (2) where the issuing magistrate wholly abandoned his judicial role ...; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the exis-

tence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Hython,* 443 F.3d 480, 484 (6th Cir.2006) (citing *Leon,* 468 U.S. at 923, 104 S.Ct. 3405).

Sinclair argues only under the third ground, contending that the good-faith exception is inapplicable because the affidavit was "bare bone[d]" and "so lacking in indicia of probable cause" that the officers could not have relied on the affidavit in good faith. *See* Appellant Br. at 20. "[T]he 'so lacking in indicia' test is less demanding than the 'substantial basis' test" that is used to determine whether probable cause exists sufficient to issue the warrant in the first place. *Washington,* 380 F.3d at 241. A "bare bones" affidavit "contains only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Laughton,* 409 F.3d 744, 748 (6th Cir.2005) (quotations omitted).

■ Detective Cooper's "affidavit included enough facts with respect to the nexus between the criminal activity and the [Snowden] residence to overcome the 'so lacking' hurdle." *Washington,* 380 F.3d at 243. Sinclair relies on several cases in which we have refused to apply the good-faith exception, arguing that this affidavit is similarly bare boned. *See* Appellant Br. at 20–23; Reply Br. at 6–9. However, the officers' affidavits in the cases on which Sinclair relies failed to establish any connection between the residence and the illegal activity. For example, in *Mills v. City of Barbourville,* 389 F.3d 568, 575–76 (6th Cir.2004), we refused

to apply the good-faith exception where the affidavit failed to state "why [the address] is being searched." There was no indication that officers "performed *any* investigation to determine whether plaintiff lived" at the address. *Id.* at 576 (emphasis added). Rather, the affidavit stated only that an informant had purchased marijuana from the plaintiff, with no mention of the residence at issue. *Id.* at 575. Similarly, in *United States v. Laughton,* 409 F.3d at 746–47, officers sought an affidavit based on a confidential informant's controlled buy of methamphetamine inside of a residence. This court refused to apply the good-faith exception to the affidavit because it "did not indicate where the confidential informant" had purchased drugs and did not state that the informant "purchased the narcotics from the suspect." *Id.* at 751. Finally, in *United States v. Helton,* 314 F.3d 812, 824–25 (6th Cir. 2003), we refused to apply the good-faith exception to the search of a residence where officers failed to corroborate statements "from an unknown, untested source" that "were sparse in relevant detail." Apart from these uncorroborated statements, officers primarily relied on "three calls a month to known drug dealers from [the] house," which was clearly insufficient to support probable cause. *Id.* at 825.

By contrast, we have applied the good-faith exception where the affidavit demonstrates "a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the warrant's validity." *Carpenter,* 360 F.3d at 596. In *United States v. Van Shutters,* 163 F.3d 331, 334 (6th Cir.1998), we upheld the search of a residence in Tennessee that officers "believed to be occupied by Shutters." Although "the affidavit completely neglect[ed] to indicate *why* the affiant believed that Shutters himself had any connection" with the

Tennessee home, we upheld the search under *Leon* because the "affidavit state[d] that the affiant ha[d] personal knowledge" of Shutters's on-going criminal activity, the affidavit "describe[d] the suspected criminal activities," and it "described the location of the Tennessee Residence with such particularity that a common sense inference is that the affiant visited the premises himself and presumably either observed Shutters in the residence, or determined through investigation that Shutters frequented the premises." *Id.* at 336–37. Accordingly, we held that "[a]pplying a practical, common sense manner reading of the warrant ... only a police officer with extraordinary legal training would have detected any deficiencies" in the warrant. *Id.* at 337 (internal quotations omitted).

Detective Cooper's affidavit is closer to the affidavit at issue in *Van Shutters* than the affidavits at issue in *Mills, Laughton,* or *Helton.* Detective Cooper's affidavit described both the Pasadena and Snowden addresses. R. 21–2 (Aff. at 1) (Page ID # 107). The affidavit also provided that, five years earlier, Sinclair was investigated for keeping drugs in his home to distribute daily on Pasadena. *Id.* at 4 (Page ID # 110). The affidavit details the officers' investigation into the drug trafficking occurring at the Pasadena residence. *Id.* The affidavit contains the officers' personal observations that Sinclair emerged from the Snowden residence, drove from the Snowden residence to the Pasadena address, and purposefully took a circuitous route to avoid being followed. *Id.* The affidavit also provides that officers saw Sinclair's vehicle outside of both locations and witnessed Sinclair use a key to enter the Snowden residence on two occasions. *Id.* at 4–5 (Page ID # 110–11). Given these observations, the affidavit supports an executing officer's "common sense inference" that Sinclair resided at the Snow-

den address. *See Van Shutters,* 163 F.3d at 337–38. Accordingly, the "affidavit was not so lacking in probable cause as to render official belief in its existence unreasonable," and *Leon*'s good-faith exception to the exclusionary rule applies. *Frazier,* 423 F.3d at 536.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Sinclair's motion to suppress.