NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0064n.06

Case No. 25-1240

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="11"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>LAWON CARTER,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

FILED

Jan 30, 2026

KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: BOGGS, NALBANDIAN, and MATHIS, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Lawon Carter sold drugs from two houses in Detroit. Because drug dealing is a dangerous business, he also kept several loaded guns around. Of course, it's against the law to sell illicit drugs. And it's illegal to possess a gun in connection with drug trafficking—doubly so when you're a felon (such as Carter). So after the ATF obtained a warrant to search Carter's houses, a jury convicted him on federal drug and gun charges. Now Carter contends that the warrant for one of the houses was no good because the government lacked probable cause to search. He also says that the government didn't provide enough evidence that he "possessed" drugs and a gun found in that house. We find his challenges meritless, so we AFFIRM.

**I.**

Carter was no stranger to law enforcement. He had been convicted on state assault and gun charges. Then, he caught more state convictions for felony drug possession and for possessing

a gun as a felon. So before the investigation that led to this case, Carter was on parole with the Michigan Department of Corrections.

But Carter popped up on the federal government's radar when the ATF investigated the Almighty Vice Lord Nation gang in Detroit. The Vice Lords held regular meetings to discuss business. And in a move more typical of a corporate boardroom than a hardened gang, they dubbed these meetings "GOALs." The ATF infiltrated GOALs through a confidential informant. In 2019, at one GOAL, the informant recorded Carter quoting prices for heroin, powder cocaine, and crack cocaine, and boasting that "choppers"—slang for AK-47-style rifles—were his "thang." R.1588, Trial Tr. Vol. 3, PageID 15631; R.2194, Order, PageID 29735. He also bragged about owning multiple phones and told a story about selling drugs during a previous stint in prison.

Carter kept attracting unwanted attention. Another ATF group—working with a different confidential informant—independently learned of his drug dealing. That informant provided the ATF with Carter's phone number and described his drug-dealing territory.

So the ATF began buying drugs from Carter through cooperators and undercover agents. It arranged several drug purchases over a two-month period. For the first purchase, Carter agreed to meet the informant and told him that he had to go to "his house" on Goddard Street to get the drugs. R.1406-2, Warrant Aff., PageID 13584; R.1599, Trial Tr. Vol. 9, PageID 17611. ATF agents watched Carter walk to the Goddard house, retrieve drugs, and sell them to the informant. Then, under similar circumstances, he sold drugs again. And again. And again.

Each time, Carter retrieved drugs—fentanyl, cocaine, heroin—from the Goddard house. And each time, he returned to the house after completing the sale. Carter had previously listed the Goddard house as his address with the Michigan Department of Corrections. He later testified that he had lived at the house when he was younger.

The Goddard house wasn't Carter's only hub. For the fifth and final sale, he delivered drugs from another house on Algonac Street. That time, he also discussed selling guns to an undercover agent. But he explained that he had guns that he didn't want to part with. Those included a rifle with a scope, laser, and drum magazine. Carter returned to the Algonac house after the sale. Around that time, he was living in the house with his romantic partner and five young children.

About a month after that final sale, the ATF applied for a warrant to search the Goddard and Algonac houses. The warrant affidavit recounted the drug purchases and the ATF's surveillance of the two houses. It detailed Carter's movements to and from the houses in connection with the drug deals. It included Carter's statement that he had to go to "his house"— on Goddard Street—to get drugs. And it set forth an informant's knowledge of Carter as a heroin and firearms dealer who distributed drugs in an area near Goddard Street. The affiant vouched for the informant's reliability and provided facts about the informant's relationship to Carter.

After securing a magistrate's approval, ATF agents executed the warrant. At the Algonac house, they found Carter and the children. But they also found loaded rifles, as well as sandwich baggies containing cocaine and crack. At the Goddard house, agents found the trappings of a drug den: a digital scale with a razor blade, both covered in white powder; fentanyl, packaged for sale; crack and powder cocaine in baggies; a loaded Romarm AK-47 propped against a door jamb; and extra ammo for the "chopper," stored in a sock. They also found evidence that Goddard was *Carter's* drug den. Carter kept his old school ID, a prescription, and a writ of garnishment addressed to him.

## II.

The Algonac and Goddard searches prompted Carter's indictment. Initially, a grand jury charged him with several drug and gun crimes. But prosecutors later named Carter in a larger racketeering case against the Vice Lords. The new indictment added RICO and drug-conspiracy counts alongside the drug and gun charges. For the individual counts, the government charged Carter with possession of firearms by a felon, possession of heroin and cocaine with intent to distribute, and possession of firearms in furtherance of drug trafficking. Three counts covered the drugs and gun at the Goddard house. Three more covered the Algonac house.

Before trial, Carter moved to suppress evidence from the Goddard and Algonac searches. He argued that the warrant affidavit failed to establish probable cause for either search. The district court denied his motion. It concluded that probable cause supported both searches. Alternatively, it reasoned, the good-faith exception to the exclusionary rule applied.

Carter went to trial. A jury convicted him on the six individual counts but acquitted him on the RICO and drug conspiracies.

After trial, Carter moved for a judgment of acquittal and for a new trial, challenging only the Goddard-related convictions. He contended that the evidence presented at trial didn't support a finding that he possessed the drugs or the AK-47 found at the Goddard house.

The district court denied his motions. It recounted that Carter sold user amounts of heroin. And it noted that during four sales, Carter had entered (or walked up to) the Goddard house—which placed the heroin in the house. The court also recalled that agents seized cocaine base from a bedroom at Goddard. And since Carter went to and from Goddard during the deals, left his personal effects there, and told an informant that he needed to "go to his house," that placed the cocaine in Carter's house as well. Carter's effort to disclaim the AK-47 fared no better. The court

4

recalled the gun's location—"within feet" of the drugs and the prescription. *Id.* at PageID 29735 (citation modified). And it observed that Carter had described "choppers" as his "thang," and that he had considered selling guns to an undercover agent. *Id.* (citation modified).

The district court sentenced Carter to fifteen years in prison, followed by five years of supervised release.

## III.

Carter appealed. He wants another shot at his district-court motions. This time, he only challenges the evidence found at Goddard.[1] He makes two arguments. First, he contends that the district court erred by denying his motion to suppress the Goddard evidence. He takes issue with the warrant affidavit, claiming that it failed to establish probable cause as to the presence of drugs and a gun at that house. Second, he asks us to reverse the district court's denial of his acquittal motion, arguing that the evidence presented at trial to support his possession of the AK-47 and the drugs at Goddard was insufficient. We address each issue in turn.

## A.

We use a mixed standard to review a district court's decision on a motion to suppress. That is, we review findings of fact for clear error and conclusions of law de novo. *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009). When a district court denies a motion to suppress, "we consider the evidence in the light most favorable to the government." *United States v. Taylor*, 121

---

[1] Carter doesn't challenge the convictions arising from the Algonac search, which resulted in convictions on exactly the same offenses and leading to exactly the same sentence as the Goddard counts. But the government doesn't suggest that the concurrent sentence doctrine could apply here. *See Amaya v. United States*, 71 F.4th 487, 491 (6th Cir. 2023) (concurrent sentence doctrine is a "species of harmless-error analysis" that "conserve[s] judicial resources by permitting courts to avoid adjudicating issues when a favorable ruling could not affect prison time or alleviate some other harm" (citation modified)); *United States v. Hughes*, 946 F.2d 536, 541 (6th Cir. 1992) (doctrine is "discretionary").

F.4th 590, 594 (6th Cir. 2024) (citation modified). And we remain "mindful of the deference the district court was required to afford the issuing judge's decision to authorize the warrant." *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc).

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. That means search warrants must "link[] the evidence to be seized and the place to be searched." *United States v. McCoy*, 905 F.3d 409, 415 (6th Cir. 2018) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)).

The Fourth Amendment requires that a magistrate have a "substantial basis for concluding" that a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation modified). So when an affidavit "relies on hearsay information from a confidential informant," we "must consider the veracity, reliability, and basis of knowledge for that information," though the upshot is whether the "issuing judge can conclude independently that the informant is reliable." *United States v. Thomas*, 605 F.3d 300, 307–08 (6th Cir. 2010); *see Gates*, 462 U.S. 213. We consider only the information contained within an affidavit's four corners. *Berry*, 565 F.3d at 338. We focus on "what good qualities it contains, not what it lacks." *Sanders*, 106 F.4th at 463 (citation modified). And we consider it based on the "totality of the circumstances, not line-by-line scrutiny." *Thomas*, 605 F.3d at 307.

Probable cause must exist at the time a magistrate issues a warrant. So information contained in an affidavit can't be stale. *See United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009) ("[S]tale information cannot be used in a probable cause determination."). Information becomes stale when a magistrate can no longer infer that "evidence of wrongdoing is still to be

found on the premises." *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998). Staleness thus "depends on the inherent nature of the crime." *Frechette*, 583 F.3d at 378 (citation modified). When we make a staleness determination, we consider four factors: (1) the ongoing nature of the crime, (2) whether the criminal is nomadic or entrenched, (3) the perishability, transferability, or enduring utility of the things to be seized, and (4) the nature of the place to be searched (a "mere criminal forum of convenience" or a "secure operational base"). *Frechette*, 583 F.3d at 378. "[T]he length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling." *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006). And we use the same standard of review "as . . . for determining the sufficiency of [a warrant] affidavit." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001).

On Carter's view, the affidavit didn't support probable cause to search the Goddard house. He contends that it didn't aver to his storage of drugs and guns at Goddard or explain that he resided there. He also characterizes the affidavit as describing an "opportunistic" dealer, not a "known" or professional one, because he only made five controlled drug sales in "user" amounts. Appellant Br. at 29–30. It follows, Carter argues, that Goddard wasn't a "drug den." *Id.* And he says that the information was stale. In support, he points to a purported 40-day gap between the last verified Goddard drug deal and the affidavit.

So Carter invites us to conclude that either (1) the information in the affidavit wouldn't have supplied probable cause at any time, or (2) regardless of its onetime value, the information had become stale by the time the ATF applied for the warrant. We decline his invitation.

First, we'll put staleness aside and consider whether the government had probable cause to believe that there would be drugs and guns at Goddard around the time of the drug sales. The affidavit's description of the sting operation supplied probable cause to believe that there would

be drugs at Goddard. Carter came from or returned to Goddard for the first four drug sales. "Evidence that one leaves a residence, engages in a drug transaction, and then returns into the residence plainly demonstrates a sufficient nexus with the location." *Sanders*, 106 F.4th at 463 (citation modified); *see also United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011) ("Commission of a drug transaction outside of a house and one participant's walking back into the house . . . plainly demonstrated a sufficient nexus with the house."). But don't take our word for it—take Carter's. He said he needed to go to "his house" to get the drugs. R.1406-2, Warrant Aff., PageID 13584. A defendant "vouching for his control over . . . drugs while likely in the residence" indicates the obvious: the drugs were in the house. *United States v. Florence*, 150 F.4th 773, 779 (6th Cir. 2025).

The same goes for the "chopper." We know that guns are "tools of the trade" in drug trafficking. *United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001). Why? Because drug traffickers commonly keep guns to "protect their narcotics and proceeds." R.1406, Warrant Aff., PageID 13579. That alone supplies probable cause to believe that there would be guns at Goddard, given its nexus to Carter's drug dealing. *See United States v. Mitchell*, 2021 WL 5772534, at *5 (6th Cir. Dec. 6, 2021) (information that the defendant was trafficking drugs from his home, along with the affiant's training and experience, "provided a basis for [the affiant] to list firearms as an item in the search warrant."). But the affidavit also recounts the last undercover sale, during which Carter bragged about his "collection of firearms" and "discussed the possible [sale] of firearms." R.1406-2, Warrant Aff., PageID 13592. And in a drug investigation, an affidavit that substantiates a defendant's gun ownership supplies probable cause to search for *both* drugs and guns. *See United States v. Garnett*, 173 F.3d 857 (table), 1999 WL 196565, at *3 (6th Cir. Mar. 30, 1999) (per curiam).

Then there's the informant, who identified Carter as a heroin and firearms dealer in an area around Goddard Street. Since the affidavit relied in part on the informant's knowledge of Carter, we'll consider the informant's credibility under *Gates*'s commonsense standard. *See, e.g.*, *Thomas*, 605 F.3d at 307–08 (considering informant's credibility under *Gates* where the affidavit relied on both the informant's statements and police corroboration).

First, the informant was reliable. The affiant had known the informant for several years and vouched for his reliability. *See United States v. Pinson*, 321 F.3d 558, 563 (6th Cir. 2003) (noting strong showing of reliability because officers "personally knew the confidential informant . . . and characterized [him] as reliable"). And the informant had previously provided information to law enforcement that resulted in prosecutions. *See Thomas*, 605 F.3d at 307.

Second, the informant told the truth. The ATF's investigation corroborated virtually every detail in the affidavit: Carter's phone number, the heroin sales, and his contemplated gun sale. That covers "veracity." *See United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) ("sufficient independent corroboration" even *eliminates* the "need to [separately] establish the veracity of the informant" (quoting *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002))). It also generally increases the statements' value. *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir. 1994) ("[T]he extent to which the tip is corroborated by the officers' own investigation is significant.").

And third, the informant had an adequate basis for knowing that Carter was a drug and gun dealer. He provided a phone number that Carter used to deal drugs and guns. He spoke to Carter about gun sales. And he told agents about Carter's area of operation and shared a physical description. That easily suffices. *See United States v. Simmons*, 129 F.4th 382, 388 (6th Cir. 2025) (informant who claimed to know the defendant, identified the defendant by his photo, and provided

police with a phone number the defendant used to deal drugs was "highly credible" based on all three *Gates* factors).

But most importantly, the affidavit described the informant in a way that allowed the *magistrate* to evaluate his credibility. *See Thomas*, 605 F.3d at 307–08 ("As long as the issuing judge can conclude independently that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause." (citation modified)). Here, the affiant explained that the confidential informant "has been working with law enforcement . . . for several years," and that the information he provided "has been corroborated by other sources . . . or by independent investigation." R.1406-2, Warrant Aff., PageID 13581. Under our totality-of-the-circumstances approach, that's plenty. *See United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005) (magistrate can independently evaluate informant's credibility if the affidavit "state[s] that police corroborated significant parts of the informant's story," or if the "affiant could attest with some detail that the informant provided reliable information in the past" (citation modified)).

All this supports a finding of probable cause.

Carter falls back on another argument. He contends that even if the affidavit would've supplied probable cause around the time of the sting operation, the information had become stale when the government applied for the warrant. In support, he claims that 40 days elapsed between the last Goddard deal and the government's warrant application. Carter's wrong about the facts— the ATF filed its warrant application less than a month after the fourth controlled purchase, when agents saw Carter walk up to the Goddard house.

But even on Carter's timeline, we're not convinced that any of the information had gone stale. Recall the four staleness factors: (1) the nature of the crime, (2) the nature of the criminal,

(3) the things to be seized, and (4) the place to be searched. *Frechette*, 583 F.3d at 378. Carter loses at each juncture.

First, Carter's drug business was an ongoing operation. He sold drugs five times, from two houses, over a period of roughly two months—including to strangers such as the undercover agent. Such a record will "generally defeat a claim of staleness." *See Greene*, 250 F.3d at 481 (confidential informant's repeated drug purchases were evidence of an ongoing drug business even though the government executed a search *23 months* after the informant had last purchased drugs); *cf. United States v. Hython*, 443 F.3d 480, 486 (6th Cir. 2006) (affidavit's description of "single controlled buy" without any "clue as to when [the buy] took place" was stale).

To be sure, the affidavit's support for an ongoing *gun*-dealing business is not the most robust that we've seen—Carter had contemplated a gun sale only once. But that's irrelevant. As we explained above, there was ample reason to believe that Carter used guns to facilitate drug dealing. Drug dealing—not gun dealing—was the relevant criminal activity. *See, e.g.*, *Greene*, 250 F.3d at 476–77, 481 (staleness determination depends on whether drug dealing is ongoing, though the warrant listed, and agents later seized, guns). At any rate, we routinely uphold warrants to search for guns based on far older information. *See, e.g.*, *United States v. Vanderweele*, 545 F. App'x 465, 469–70 (6th Cir. 2013) (seven months); *United States v. Lancaster*, 145 F. App'x 508, 513 (6th Cir. 2005) (two years).

Second, Carter wasn't a nomad. He entrenched his operation in the Goddard and Algonac houses. We'll focus on Goddard, since it's the house at issue here. The first four purchases involved trips to the Goddard house. Each time, Carter walked through (or hung around) the front door as if it were his house—because it was. And he retrieved drugs from Goddard. That's enough for us to conclude that Goddard was a hub (or *the* hub) of Carter's business. *United States v.*

11

*Jefferson*, 2025 WL 2674369, at *4 (6th Cir. Sept. 18, 2025) (controlled buys and officer observation show that defendant was entrenched in a house even though he dealt drugs from two houses).

Third, the government sought to seize durable items from the Goddard house. The affidavit listed electronic devices, guns and accessories, and various books and records as objects of the search. These items endure—sometimes indefinitely. *See, e.g.*, *Frechette*, 583 F.3d at 379 (electronic records "typically persist in some form . . . even after [they] have been deleted"); *United States v. Goodwin*, 552 F. App'x 541, 545 (6th Cir. 2014) ("Firearms are durable goods and might well be expected to remain in a criminal's possession for a long period of time." (citation modified)); *United States v. Hollins*, 2025 WL 1898030, at *5 (6th Cir. July 9, 2025) ("[T]he fact that the warrant targeted not just drugs, but also physical evidence of drug activity, including firearms, mitigates the staleness of older information."); *United States v. Arrington*, 2022 WL 157820, at *4 (E.D. Mich. Jan. 18, 2022) (documents reflecting information used in crimes are durable). Drugs, of course, aren't durable. They're made to be snorted, smoked, swallowed, injected, or inhaled. So they're "usually sold and consumed in a prompt fashion." *Frechette*, 583 F.3d at 378. But Carter doesn't benefit from that fact because the affidavit also "contains evidence of ongoing drug deals." *United States v. Easter*, 2026 WL 18812, at *2 (6th Cir. Jan. 2, 2026). That involves replenishing supply. When the old drugs go out, new drugs come in—at least if you want to make money. *See United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017) ("[N]arcotics underlying an ongoing conspiracy to traffic drugs are likely to be at an operational base.").

Fourth and finally, Goddard was Carter's "secure operational base." *Frechette*, 583 F.3d at 378. Carter acted as though Goddard was his house because it was. He came and went through the front door as he pleased—and many times when he left, he brought drugs. Agents found a

digital scale with white powder, a razor blade, a blender coated with white powder, a loaded gun and extra ammunition, and plastic baggies of crack and powder cocaine inside the home. As one agent testified, the residence was "very typical of what [he is] used to seeing in a house that's utilized for either processing or distributing narcotics." R. 1639, PageID 19259. So Goddard wasn't just a "forum of convenience." *See Spikes*, 158 F.3d at 923. It was indispensable to Carter's drug activities. *See United States v. Sinclair*, 631 F. App'x 344, 348 (6th Cir. 2015) ("[B]ecause officers observed [the defendant] at [a residence] on four separate occasions . . . the . . . address is closer to a secure operational base." (citation modified)).

We have little trouble concluding that the information in the affidavit supporting the Goddard search wasn't stale.[2]

**B.**

Carter also mounts a sufficiency-of-the-evidence challenge. He asks us to reverse the district court's denial of his acquittal motion. On his view, the Goddard convictions—felon in possession of a firearm, possession of cocaine and heroin with intent to distribute, and possession of a gun in furtherance of drug trafficking—weren't supported by the evidence at trial. For the first two counts, he disputes only the possession element. For the gun in furtherance of drug trafficking count, he disputes all the elements (so, including possession). We disagree with Carter's assessment.

A defendant "bears a heavy burden when making a sufficiency of the evidence challenge." *United States v. Carson*, 560 F.3d 566, 580 (6th Cir. 2009). That's because we "view[] all evidence in the light most favorable to the prosecution and determine[] whether there is any evidence from

---

[2] We therefore decline to address the good-faith exception to the exclusionary rule or whether the terms of Carter's parole permitted a warrantless search.

which a reasonable jury could find guilt beyond a reasonable doubt." *Id.* at 579–80; *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) ("[T]his inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." (citation modified)). So we "give full credit to the responsibility of the jury to weigh the evidence, to make credibility determinations, and to draw inferences." *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013). That is, we don't "insert our own findings of fact." *Id.*

Possession is the common thread among all three counts. So we'll discuss the concept first. Possession "need not be exclusive"—it can be "joint." *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973). And it can be actual or constructive. *United States v. Fairley*, 137 F.4th 503, 512 (6th Cir. 2025). Actual possession requires "immediate possession" or "direct physical control." *United States v. Hunter*, 558 F.3d 495, 504 (6th Cir. 2009) (drugs); *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007) (guns). Constructive possession "exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object." *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998). So it requires specific intent. *United States v. Newsom*, 452 F.3d 593, 606 (6th Cir. 2006). To prove constructive possession, the government must demonstrate *either* (1) "dominion or control over the item itself" *or* (2) "dominion over the premises where the item is located." *United States v. Latimer*, 16 F.4th 222, 225 (6th Cir. 2021) (citation modified). And it can rely solely on circumstantial evidence. *United States v. Reed*, 141 F.3d 644, 651 (6th Cir. 1998).

**i.**

A reasonable jury could conclude that Carter possessed the drugs at the Goddard house. The jury learned about Carter's drug trafficking through the Vice Lords meeting, phone calls that

one of the informants recorded with Vice Lords members, and messages and photos that the government recovered from Carter's phone. *See, e.g.*, *United States v. Essex*, 2022 WL 17078717, at *3 (6th Cir. Nov. 18, 2022) ("any rational jury member could conclude defendant constructively possessed" drugs found in trailer where government presented circumstantial evidence "tying defendant to drug-trafficking activities"); *United States v. Johnson*, 8 F. App'x 493, 495 (6th Cir. 2001) (recorded conversation between the defendant and a confidential informant supported drug possession). And the evidence doesn't stop there. Five controlled sales confirmed Carter's access to drugs and his use of the Goddard and Algonac houses as criminal bases. *See United States v. Michael*, 576 F.3d 323, 326 (6th Cir. 2009) (the defendant's drug sales to undercover officers near his apartment support his constructive possession of drugs in the apartment).

It doesn't matter that Carter didn't live at Goddard at the time. What matters is that evidence showed that Goddard was his base of operations. He came and went as he pleased, he stored drugs there, he kept his personal effects there, and he conducted drug sales near the house. *See United States v. Sadler*, 24 F.4th 515, 550 (6th Cir. 2022) (the defendant constructively possessed drugs found in house where he was "seen several times" and where the house was a "suspected stash location" (citation modified)); *United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010) (the defendant constructively possessed drugs found in house he had "unlimited access to" and where he stored personal property, including his driver's license and personal papers).

A reasonable jury could also conclude that Carter possessed the AK-47 at Goddard. The jury heard about his gun possession from one of the informants, from the undercover agent (who discussed a potential gun purchase with Carter), and from Carter himself, who described "choppers" as his "thang." R.2194, Order, PageID 29735. The jury saw photos of guns sent to Carter by prospective sellers. And it heard federal agents testify that drug dealers commonly own

guns to protect themselves and their wares. *See Hardin*, 248 F.3d at 499. Then there's the rifle's location: near a variety of drugs. That supports constructive possession because it "provide[s] a basis for the jury to conclude that the defendant had a powerful motive to protect himself and his . . . investment." *Thompson v. Skipper*, 981 F.3d 476, 482 (6th Cir. 2020) (citation modified); *see also United States v. Maliszewski*, 161 F.3d 992, 1018 (6th Cir. 1998) (where the "bulk" of drug activity occurred in a basement, a gun's location near the basement supported possession); *United States v. Foster*, 832 F. App'x 401, 405 (6th Cir. 2020) (a gun's location near a digital scale and meth "sufficiently tied" it to drug activity and therefore supported possession). We've routinely concluded—in several contexts—that drug-trafficking defendants constructively possess firearms found in their drug dens. *See, e.g.*, *Kincaide*, 145 F.3d at 782 (sufficiency of the evidence challenge); *United States v. Lanier*, 850 F. App'x 419, 422 (6th Cir. 2021) (sentencing enhancement).

Carter disagrees on the law and on the facts. He makes a series of arguments to distance himself from the drugs and the AK-47 found at Goddard. We aren't convinced.

First, Carter makes much of his "non-exclusive access to Goddard" in disclaiming his possession of the drugs and the gun. Appellant Br. at 49. He contends that he didn't have "exclusive dominion" over the house because "other persons . . . had access to Goddard." *Id.* And he points out that the government didn't find keys to Goddard—because, he claims, he didn't have any. But exclusive or gated access isn't a necessary condition to constructive possession. In fact, virtually all of our case law says the opposite. *See, e.g.*, *United States v. Hall*, 20 F.4th 1085, 1107 (6th Cir. 2022) (rational factfinder could find that defendant was "jointly and constructively in possession" of drugs because "he was one of the occupants of the truck in which the drugs were found" and because he communicated with another defendant "to execute a drug conspiracy");

*United States v. Cantrell*, 807 F. App'x 428, 430, 433 (6th Cir. 2020) (defendant possessed drugs and paraphernalia found in car in which defendant was a passenger because of other evidence implicating the defendant in a drug-trafficking conspiracy). So even taking Carter's assertion at face value, his argument fails.

Second, Carter points to two cases in which a defendant's mere proximity to a gun wasn't enough to establish constructive possession. But those cases don't map onto these facts. First, he cites *United States v. Bailey*, 553 F.3d 940 (6th Cir. 2009). In that case, "the only evidence supporting Bailey's conviction . . . [was] the fact that the loaded gun was found underneath Bailey's seat in the stolen car he was driving and that he had attempted to evade police." *Id.* at 945. Second, he cites *United States v. Beverly*, 750 F.2d 34 (6th Cir. 1984), in which the defendant stood *near* a wastebasket in *someone else's* house. Neither case is on point. This case isn't about "proximity"—the government found Carter at the Algonac house, not the Goddard house. Instead, the government searched the Goddard house because it had thoroughly investigated Carter's drug and gun dealing activities. And that investigation unearthed significant circumstantial evidence— including Carter's own boasts—that pegged Carter as a drug trafficker and a gun dealer operating out of the Goddard house. That suffices. *See Kincaide*, 145 F.3d at 782 (evidence tying the defendant to a drug-trafficking conspiracy run out of an apartment established the defendant's constructive possession of firearms in that apartment).

And third, Carter contests his ownership of the AK-47 by noting the lack of DNA evidence tying him to the gun and by pointing to a lack of evidence that he was armed during drug sales. These arguments fail. We've never required any one kind of evidence to establish possession. *See United States v. Garcia*, 758 F.3d 714, 720 (6th Cir. 2014) ("No common factual thread runs through each of the [possession] cases, and neither the presence nor the absence of any particular

fact has been deemed dispositive."); *United States v. Morrison*, 594 F.3d 543, 545 (6th Cir. 2010) (government proved possession despite there being "no fingerprints on the gun" and "no proof that [defendant] owned the gun"). As we've discussed, the government presented myriad evidence of Carter's drug and gun activities. Carter can't hang his hat on the absence of factual certainty.

**ii.**

That covers the drug and gun possession counts. What's left is the combination: whether the jury could find that Carter possessed the AK-47 *in furtherance* of drug trafficking. We conclude that it could.

When we analyze whether a defendant possessed a gun in furtherance of drug trafficking, we consider several non-exclusive factors. Those factors include the gun's strategic placement, whether it was loaded, the type of gun, the legality of its possession, the type of drug activity conducted, and the timing and circumstances under which the gun was found. *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001).[3] Our goal is to "not lose sight of the forest (whether the defendant possessed the firearm to facilitate the crime) for the trees (whether or how each factor applies)." *United States v. Maya*, 966 F.3d 493, 501 (6th Cir. 2020). But it's not enough for the government to find guns in a drug house. *Mackey*, 265 F.3d at 461–62. It must demonstrate a "specific nexus" between the gun and the crime. *Id.* at 462.

Carter possessed the Goddard house AK-47 in furtherance of drug trafficking. Start with the gun's placement: propped up against a door jamb, mere feet from a drug stash. *See United States v. Couch*, 367 F.3d 557, 561 (6th Cir. 2004) (noting that while "possession of a firearm in

---

[3] While the first factor—strategic placement—is undoubtedly important, we haven't always been clear on whether it's the test's one true requirement or just another "non-exclusive data point to help answer the ultimate question." *See United States v. Maya*, 966 F.3d 493, 501 (6th Cir. 2020) (citation modified) (noting cases on both sides). But since all the factors favor the government on these facts, we leave that question for another day.

the same premises as the drug trafficking activities alone is insufficient," a jury "can reasonably infer that guns "strategically located" for "defense or deterrence" were used in furtherance of drug trafficking (citation modified)). The gun was also loaded. *Mackey*, 265 F.3d at 462 (noting the relevance of a gun being loaded). That makes sense—Carter kept it at the ready to protect his goods. And the rifle was of a type commonly used by drug traffickers. *See Friskey v. Bracke*, 2020 WL 465026, at *2, 4 (E.D. Ky. Jan. 28, 2020) (noting the significance of officer testimony that Romarm rifles—the exact type of AK-47 at issue here—are "commonly used" in drug operations and typically found in "stash houses"). So common that the Vice Lords dubbed them "choppers" and "Ks." R.1588, Trial Tr. Vol. 3, PageID 15629–31. Next, since Carter was a convicted felon, he couldn't possess a gun. The fact that he did—at great risk to his liberty—suggests an illicit purpose. *See Mackey*, 265 F.3d at 462–63; *United States v. Randolph*, 685 F. App'x 429, 434 (6th Cir. 2017). Then there's the nature of Carter's operation. It's not lost on us that the quantities and dollar amounts here don't stack up against the larger drug conspiracies we've seen. *Cf. Maya*, 966 F.3d at 502 (defendant sold large quantities of drugs and kept $20,000 in cash and money orders in his bedroom). But that factor still favors the jury's verdict because Carter's drug dealing was "ongoing"—suggesting sustained vigilance and an enduring need for protection. *See id.* Finally, the timing and circumstances favor the jury's verdict because the government found the gun, the drugs, and the paraphernalia in the same search. *United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013).

Carter's arguments to the contrary are unpersuasive.

First, he points to the lack of forensic evidence linking him to the gun. That argument goes to possession, not the "in furtherance" element. And we've already rejected it in the possession context.

Second, he notes that there's "no evidence the [gun] was at Goddard on any date except September 5, 2019"—the date of the search. Appellant Br. at 51. But we've never required the government to establish a gun's location or use before a search. *See, e.g.*, *Mackey*, 265 F.3d 457 (the defendant possessed a shotgun in furtherance of drug crimes even though the government uncovered the gun during a search based on a drug tip and controlled purchases, not the government's pre-search efforts to link the gun to drug activity). And that's implicit in our test. It makes little sense for us to consider the "circumstances under which the firearm was found," *see id.* at 462, if we also required the government to identify a gun in a drug house or at a drug deal *before* a search.

Third and finally, Carter argues that there's "no evidence [he] was ever armed during his known drug sales, let alone . . . with the Romarm firearm." Appellant Br. at 51. Putting aside his questionable proposition that drug dealers patrol Detroit wielding full-size rifles (rather than more discreet options like handguns), a defendant "doesn't have to be *observed* holding a firearm while committing a drug crime" to possess a gun in furtherance of drug trafficking. *United States v. McKinney*, 818 F. App'x 412, 416 (6th Cir. 2020). It suffices that Carter "stored guns in the house to protect his drug stash." *United States v. Steele*, 919 F.3d 965, 970 (6th Cir. 2019).

## IV.

For these reasons, we AFFIRM.